### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

THOMAS VON RYBURN,

     Plaintiff,

   v.

GHALIAH OBAISI, ET AL.,

     Defendants.

No. 14 CV 4308

Magistrate Judge McShain

### MEMORANDUM OPINION AND ORDER

Plaintiff Thomas Von Ryburn is a disabled inmate in the custody of the Illinois Department of Corrections (IDOC). In June 2014, Ryburn brought this suit under 42 U.S.C. § 1983, alleging that Saleh Obaisi, the former Medical Director at the Stateville Correctional Center, and Wexford Health Sources, Inc., Obaisi's employer and the entity that provides medical care to IDOC prisoners, were deliberately indifferent to his degenerative spinal condition and neurological problems.

The Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

Pending is the defendants' motion for summary judgment. [240].[1] For the following reasons, the motion is denied.

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from Ryburn's corrected response to defendants' Rule 56.1 statement, [257], and defendants' response to Ryburn's statement of additional facts, [264], where both the asserted fact and the opposing party's response are set forth in one document. I disregard any arguments raised in the Local Rule 56.1 statements, additional facts included in responses or replies, and statements

## Background

On October 25, 2012, two IDOC officers transported Ryburn from the Stateville Correctional Center to the Will County courthouse for a hearing. Then 53 years old, Ryburn needed a wheelchair to move about. [254–3] ¶ 3. After the hearing ended, the officers tried to carry Ryburn, seated in his wheelchair, down a flight of stairs inside the courthouse, but the officers dropped the chair down the stairs. [*Id.*] Ryburn hit his head and neck on the stairs, and part of the wheelchair dug into Ryburn's back. [*Id.*].[2] Besides pain in his head, neck, and back, Ryburn experienced hearing loss, ringing in his ears, dizziness and balance issues, and memory loss after the accident. [254–3] ¶ 4.

When he returned to Stateville, Ryburn was evaluated by Physician's Assistant LaTanya Williams. [241] ¶ 15. Williams's notes reflect that Ryburn complained of hitting only his neck and back, but Ryburn says that he told Williams his head "bounced down the stairs like a basketball." [241] ¶ 16; [254–3] ¶ 5.[3] Ryburn

---

that are unsupported by admissible evidence (or where a party fails to follow Local Rule 56.1's direction to cite to supporting material in the record). Only facts that are properly controverted will be considered disputed.

[2] Ryburn brought deliberate-indifference claims against IDOC and the two guards who dropped his wheelchair. These parties reached a settlement in October 2016. [111].

[3] Defendants assert that Ryburn's declaration [254–3] and notes [254–5] "lack foundation as Plaintiff testified there are a lot of things he cannot remember anymore, both short-term and long-term." [265] 5. To the extent that defendants mean to argue that the Court cannot consider these materials at summary judgment, I disagree. Ryburn explained in his declaration that he "took notes of my encounters with Dr. Obaisi and . . . other medical staff as best I could, usually within a short period of time after the encounter," the notes "reflect [his] personal knowledge at the time of the writing," and the notes are accurate. [254–3] ¶ 8. That provides an

was alert and oriented, but Williams found that his cervical spine and lumbar spine were tender. [241] ¶¶ 15–16; [257] ¶ 16. Williams checked Ryburn for a concussion, recommended that he continue taking his current pain medications, and referred him to the medical director, Dr. Obaisi, for "[f]urther assessment." [257] ¶ 17.

### A. Ryburn's Care Under Dr. Obaisi

Dr. Obaisi, who was trained in general surgery and board-certified in urgent care medicine, began working for Wexford in 2002. [241] ¶ 7. In August 2012, Obaisi became Stateville's Medical Director, a position he held until his death in December 2017. [*Id.*].[4]

Ryburn first saw Dr. Obaisi in connection with his fall on November 17, 2012. [241] ¶ 19. The parties dispute whether Ryburn told Obaisi that he hit his head, but it is undisputed that Ryburn reported that the pain in his upper back and neck had been worse since the accident. [241] ¶ 19; [257] ¶ 19. Dr. Obaisi prescribed the pain medication Tramadol and ordered an x-ray of Ryburn's cervical spine and lumbar spine. [241] ¶ 19. The x-rays showed moderately advanced degenerative joint disease at levels C5–C7 and mild to moderate degenerative joint disease with a possibly degenerating disc at L5–S1. [241] ¶ 20.

On January 9, 2013, Ryburn saw Dr. Obaisi again and complained of headaches, amnesia, and ringing in his ear. [241] ¶ 21. Obaisi prescribed Valium,

---

adequate foundation to show that Ryburn has personal knowledge of the matters discussed in his declaration and notes.

[4] The Court has substituted the independent executor of Dr. Obaisi's estate, Ghaliah Obaisi, as a defendant in this case. [189].

3

assessed Ryburn with "neurological disorder CNS," and recommended that he undergo an MRI. [*Id*.]. Dr. Obaisi also referred Ryburn to the Neurology Department at the University of Illinois-Chicago Medical Center (UIC) for an evaluation of his headaches, amnesia, hearing impairment, and dizziness. [*Id*.].

When a Medical Director refers an inmate for treatment outside the prison, Wexford reviews the referral at a "collegial review session" where the Medical Director and a second Wexford physician decide whether to authorize the treatment. [254] ¶ 38. On January 14, 2013, Obaisi and another Wexford doctor met in collegial review and approved the neurology referral. [241] ¶ 22. Thereafter, an IDOC employee scheduled Ryburn's appointment for June 21. [*Id*.]. The parties do not cite any evidence that explains why this appointment did not occur until more than five months after Wexford authorized the referral. [257] ¶ 22.

### 1. First Neurological Evaluation

At UIC, Ryburn was evaluated by neurologist Cathy Helgason. [241] ¶ 30. Dr. Helgason's notes reflect that Ryburn's chief complaint was dizziness that "may dayte [*sic*] back to a fall." [244–1] 13. Ryburn also reported "difficulty with memory on some issues, lost his hearing on the right side, constant ringing in the ears, and pain in the neck and the middle left part of his back." [*Id*.]. Helgason concluded that Ryburn's mental state, motor functioning, gait, coordination, and station were normal. [241] ¶ 30; [244–1] 14. Dr. Helgason assessed Ryburn with migraine headaches, possible seizures, hearing loss (possibly traumatic), and osteoarthritis of the spine. [241] ¶ 30. She recommended that Ryburn return for a follow-up appointment in six months,

4

after undergoing MRIs of his brain and C-spine. [*Id.*]. It is undisputed, however, that Ryburn did not see a neurologist for nearly two years. [241] ¶ 48.

## 2. Ryburn's Condition: June 2013–June 2015

Back at Stateville, Dr. Obaisi reviewed Dr. Helgason's recommendations and referred Ryburn for the recommended MRIs. [241] ¶ 33. The MRIs, taken in August 2013, showed that Ryburn's brain was normal, and that there was a disc bulge at C3–C4 and degenerated intervertebral discs at C4–C5, C5–C6, and C6–C7. [257] ¶ 35. According to the radiologist who took the scans, the results of the spinal MRI were "grossly stable" compared to an MRI taken in 2009. [241–1] 17.

Meanwhile, Ryburn continued to seek treatment for his back and neck pain.

On October 5, Ryburn reported to a nurse that he had pain in his back radiating into his hips that he rated at an 8/10 severity. [257] ¶ 37. At appointments with Obaisi on December 9, 2013 and March 11, 2014, Ryburn complained of back and neck pain, and Obaisi prescribed Tramadol, fish oil, and Tolnaftate cream. [241] ¶¶ 40–41. While treating Ryburn, Dr. Obaisi never prescribed Lyrica or Cymbalta, which can be used to treat neuropathic pain. [264] ¶ 18.

Ryburn saw Obaisi again on March 24, 2014, this time complaining of chronic pain in his neck and back, lightheadedness and dizziness, memory problems, ringing in his ears, and nerve issues. [241] ¶ 41; [254–5] 2. After this appointment, Obaisi referred Ryburn for a follow-up visit with UIC neurology. [241] ¶ 42. Although Wexford authorized the referral on April 1, 2014, Ryburn's follow-up appointment, which was scheduled by an IDOC employee, did not occur until June 12, 2015. [*Id.*].

5

The parties dispute whether Dr. Obaisi was responsible for ensuring that off-site medical appointments were scheduled within an appropriate timeframe. Wexford maintains that Obaisi's job duties did not extend to "ensur[ing] that the IDOC on-site scheduler actually schedules the appointment." [252] ¶ 42. Relying on the testimony of a Wexford corporate representative, Ryburn maintains that Obaisi could have raised concerns about off-site scheduling with Wexford and IDOC. [257] ¶ 42. Ryburn also cites the representative's testimony that a Medical Director works with the prison's healthcare team to ensure proper scheduling and "would be aware of the wait times" at an external facility like UIC. [257] ¶ 42; [241–4] 64:9-10. Again, the parties do not cite any evidence that explains why the appointment did not occur until more than fourteen months after Wexford authorized it. [241] ¶ 42.

On August 12, 2014, Ryburn met with Dr. Obaisi to discuss the results of the MRIs taken a year earlier. [241] ¶ 44. Obaisi explained that there were no acute changes and observed that Ryburn was scheduled for a neurology appointment in a "couple months." [241] ¶ 44; [244] 15. Dr. Obaisi recommended that Ryburn follow-up as needed, but he did not treat the disc bulge and degenerated discs. [244] 15; [257] ¶ 44.

On March 12, 2015, Dr. Obaisi evaluated Ryburn for medication renewal. [241] ¶ 47. Ryburn complained that his memory was worse, that he had increased ringing in his ears, continued headaches, and pain in his neck, and that he was experiencing drowsiness, fatigue, and numbness in his thigh. [254–5] 3–4. Obaisi wrote in his notes that there were no changes in Ryburn's condition and prescribed Tylenol with

6

codeine, fish oil, and T-Gel. [241] ¶ 47. Ryburn maintains that Dr. Obaisi refused to address his increased pain and numbness. [254–5] 4.

### 3. Second Neurological Evaluation

Ryburn returned to UIC neurology on June 12, 2015 for an evaluation by Dr. Helgason. [241] ¶ 48. Helgason recorded Ryburn's complaints of neck pain extending to his occiput, which occurred daily and often woke him from sleep, dizziness when standing up, and ringing in his ears. [*Id.*]. Helgason's objective findings indicated that Ryburn's mental status, motor and sensory functions, coordination, and gait were normal. [241] ¶ 49. But Dr. Helgason observed that Ryburn's head and neck symptoms had worsened since 2013. [257] ¶ 50.

Ryburn did not sustain a traumatic brain injury during the courthouse fall, but Dr. Helgason opined that Ryburn's symptoms were typical of someone with posttraumatic migraines; she also assessed that his neck pain was causing his headaches. [241] ¶¶ 49–50; [257] ¶ 50. Helgason recommended that Ryburn see a neuropsychologist, visit a pain clinic, and return for a follow-up appointment in one year (while also suggesting that Ryburn "plz call for earlier appointment if needed"). [241] ¶ 49; [241–1] 12. A copy of Dr. Helgason's recommendations was placed in Ryburn's IDOC file, and Ryburn told Dr. Obaisi that Helgason recommended a follow-up appointment in one year. [244] 24; [254–3] ¶¶ 9–10. On July 6, Obaisi told Ryburn that he was approved to visit a pain clinic and see a neuropsychologist. [241] ¶ 51.[5]

---

[5] Ryburn was evaluated at the UIC Pain Clinic in October 2015. [241] ¶ 57. Doctors there noted that Ryburn had refused many pain medications because of adverse or allergic reactions. [*Id.*]. The doctors' report states that Lyrica and Cymbalta were

#### 4. Ryburn's Falls

On July 18, 2016, Ryburn reported to Wexford medical staff that he had fallen and hit his head. [264] ¶ 10. The next day, Ryburn fell in his cell and hit his head. [257] ¶ 64. He saw a nurse on July 21, complaining of lightheadedness and dizziness, and the nurse observed an abrasion on the top of his head; an x-ray established that Ryburn had not fractured his skull. [*Id.*]. A doctor who saw Ryburn on July 29 noted that he was complaining of headaches and was due for a visit with UIC neurology. [*Id.*]. On August 3, Dr. Obaisi evaluated Ryburn, who was feeling lightheaded after a fall in the shower. [241] ¶ 65. Ryburn fell in his cell again in mid-October. [241] ¶ 67; [254] ¶ 12. He also began experiencing pain that spread from his upper spine and lower neck to his right shoulder and arm. [254] ¶ 13.

After examining Ryburn on August 3, Dr. Obaisi referred him to UIC neurology for an evaluation of his lightheadedness. [254] ¶ 11. At a collegial review session that Obaisi attended on August 9, however, Wexford refused to authorize the referral. [241] ¶ 65; [244] 36. According to a note from the session, Ryburn already had a "significant workup" by "UIC Neuro in 2013–15" and had "no neurological deficits[.]" [244] 36.

---

"cost prohibitive," but it is unclear if this was the doctors' opinion or if they had recorded Ryburn's own statement to that effect. [244–1] 1. The pain doctors concluded that there were "[n]o available interventional nor pharmacologic therapies available [to treat his pain] due to history of allergies." [244–1] 9. In pain management, the term "interventional therapy" is "a term of art . . . that refers to certain non-surgical treatments, like epidural injections, facet joint injections, and spinal cord stimulation." [257] ¶ 57 (internal emphasis omitted).

### 5. Neuropsychology Referral

Back in January 2016, Dr. Obaisi attended a collegial review for Ryburn's neuropsychology referral. [241] ¶ 60. The referral was canceled because the "neuropsychology clinic at UIC does not see inmates." [244] 36. Obaisi suggested that Ryburn see an onsite psychologist, rather than a different neuropsychologist, because he was "cognitively sound, not losing weight and can get thru his ADL's [activities of daily living] w/o difficulty." [*Id.*]. Ryburn had a meeting with a staff psychologist who told him that a psychiatrist would see him, but Ryburn never met with a state psychiatrist or neurologist. [254–3] ¶ 15. Ryburn testified he was offered group therapy at Stateville. [241–1] 92:12–24.

In November 2016, and as a result of the settlement he reached with the IDOC defendants, Ryburn was evaluated by clinical psychologist Gregory Sarlo. [241] ¶ 68; [254–3] ¶ 16.

Dr. Sarlo concluded that Ryburn had "repetitive concussive damage to his brain in the parietal and subcortical region with impairments in processing speed, which negatively impacts his memory and fine motor skills." [255–3] 37. Relying on Ryburn's description of his symptoms, Sarlo opined that Ryburn's fall in October 2012 may have exacerbated his neurological difficulties. [257] ¶ 69. Dr. Sarlo recognized that Ryburn had sustained many concussions and head and brain injuries before his incarceration, and he opined that those injuries likely contributed to Ryburn's memory issues. [241] ¶ 69. He recommended that Ryburn have annual MRIs to

9

"monitor[ ] changes in his symptoms" and participate in individual psychotherapy and group therapy. [255–3] 38.

On April 27, 2017, Dr. Obaisi saw Ryburn about his complaints of occasional dizziness. [241] ¶ 73. Although Obaisi knew that Dr. Sarlo had not yet released his report [244–2] 19, he referred Ryburn to UIC neurology to evaluate his dizziness and disequilibrium. [241] ¶ 73. Several days later, however, Obaisi met in collegial review and canceled the referral because Ryburn had not released Dr. Sarlo's report and had not "cooperate[d] with neurologist in the past." [241] ¶ 74; [244] 38. Ryburn admits that he withheld Dr. Sarlo's report (on the advice of counsel [257] ¶¶ 74–75), but defendants do not cite evidence of Ryburn's alleged noncompliance with a neurologist. [241] ¶ 74. A note from the May 3 collegial review also stated that Ryburn's 2013–2015 neurology workups had found no neurological deficits. [244] 38.

## B. Ryburn's Condition After Dr. Obaisi's Death

On May 12, 2018, Ryburn complained to medical staff of pain and numbness in his arms. [254] ¶ 20. On June 8, a nurse saw Ryburn about his dizziness and difficulty walking. [254] ¶ 20; [264] ¶ 20. Ryburn fell on July 9 due to what he described as a "drunk spell." [264] ¶ 20. On August 14, a Wexford doctor recorded Ryburn's complaints of dizzy spells and brain damage and referred him to UIC neurology, and Wexford authorized the referral. [254] ¶ 22; [264] ¶ 22.

In November 2018 – more than three years after his last neurological evaluation, and nearly a year after Dr. Obaisi's death – Ryburn returned to UIC neurology. [241] ¶ 77. Dr. Stefania Maraka found that Ryburn's language, cranial

nerves, and motor functions were normal. [*Id.*]. Dr. Maraka did not diagnose cognitive deficiencies, but she observed that Ryburn had cervical and lumbar degenerative disease with ataxia (difficulty walking and imbalance). [254] ¶ 23; [257] ¶ 77. On Dr. Maraka's recommendation, Ryburn had an MRI of his cervical spine. [254] ¶ 25. It showed, at the C3-C4 level, a "left paracentral disc herniation compromising the thecal sac and producing severe stenosis of the thecal sac." [255–4] 14. It also revealed "bilateral uncovertebral and facet arthropathy producing severe bilateral neural foraminal narrowing." [*Id.*].

Dr. Maraka saw Ryburn again on March 27, 2019. [244] ¶ 78. Ryburn reported less sensation on the right upper and lower extremities and the right side of his face as well as decreased vibration on the right side of his face. [*Id.*]. Maraka diagnosed a disc prolapse at C3–C4, concluded that the disc was herniated and pressing against Ryburn's spine, and referred him to a neurosurgeon. [254] ¶ 26.

On April 29, Ryburn saw UIC neurosurgeon Konstantin Slavin. [254] ¶ 28. Slavin concluded that Ryburn's spinal cord was compressed at the C3–C4 area and noted that the compression was a "longstanding" problem. [255–4] 17–18. Dr. Slavin opined that the compression would explain Ryburn's loss of balance and coordination issues and some of his headaches. [254] ¶ 28. A CT scan confirmed that Ryburn was suffering from spinal stenosis at C3–C4. [254] ¶ 29.

Dr. Slavin saw Ryburn in September for an "evaluation of his cervical myelopathy," a condition that can cause headaches and, if left untreated, paralysis. [254] ¶ 30; [241–10] 116:5–10; [268] 8. Slavin proposed an anterior cervical

discectomy and fusion to remove the herniated disc and decompress the spinal cord. [254] ¶ 30. On October 24, Dr. Slavin successfully removed the herniated disc at C3, decompressed Ryburn's spine, and fused the C3 and C4 vertebrae. [254] ¶ 31. After the surgery, Slavin found that Ryburn's "condition has been gradually improving," and Ryburn reported having better sensation in his hands, legs, and feet. [254] ¶ 31.

### C. Expert Testimony

Ryburn's expert, Dr. Morris Fisher, is a retired physician who is board-certified in neurology and psychiatry. [241] ¶ 13. He opined that Dr. Obaisi met the standard of care in January 2013 by ordering an MRI of Ryburn's brain and spine and referring him for a neurological evaluation. [264] ¶ 33. But Dr. Fisher testified that Obaisi acted outside the standard of care by failing to obtain that MRI until August 2013, ten months after Ryburn's fall. [254] ¶ 33; [241–9] 127:4–19. According to Fisher, the standard of care required Dr. Obaisi to follow Dr. Helgason's recommendation that Ryburn have a follow-up appointment after his 2013 and 2015 evaluations. [254] ¶ 33; [241–9] 129:2-130:19.[6] None of the records that Dr. Fisher reviewed suggested that Obaisi made a medically-based judgment not to schedule the follow-ups. [254] ¶ 33; [241–9] 132:2-6.

---

[6] Defendants object in their Response to Ryburn's Statement of Additional Facts that Dr. Fisher did not disclose these opinions in his report [264] ¶¶ 35–36, but they do not argue in their motion or reply brief that the Court should exclude this evidence from its summary judgment analysis. I therefore include a discussion of Dr. Fisher's opinions, but my decision to deny summary judgment does not depend on those opinions.

Based on his review of the treatment record, Dr. Fisher opined that Ryburn's condition had deteriorated over time, as evidenced by Ryburn's falls in 2016 and the worsening of his cervical stenosis. [254] ¶ 36; [241–9] 133:3–22, 152:14–18. Fisher explained that cervical stenosis can cause sensory loss in the lower extremities, and that compression of the cervical spine causes sensory loss and gait problems; these, in turn, can lead to loss of balance and falls. [241–9] 83:20–84:20, 91:23–92:3. Dr. Fisher testified that if Ryburn had returned to UIC before 2018, a neurologist might have diagnosed his cervical stenosis and referred him for neurosurgery before 2019. [241–9] 133:23–34:2, 135:2–8. He opined that the delays in properly treating Ryburn may have caused his falls. [257] ¶ 79; [241–9] 96:15–23.

Dr. Alan Shephard, the defense expert, is a professor of neurology at Northwestern University and board-certified in neurology and psychiatry. [241] ¶ 14. Shephard testified that an MRI was not medically indicated "immediately" – that is, within a few days – after Ryburn's fall in October 2012. [241] ¶ 80; [241–12] 5. Nor did the results of the August 2013 MRI indicate, in Shephard's view, the need for Ryburn to follow-up with Dr. Helgason in six months after the first evaluation. [241] ¶ 80; [241–12] 6.

In his report, Dr. Shephard opined that Obaisi "did not breach the standard of care in providing treatment to Mr. Ryburn related to [his] complaints following the fall in October 2012, including related to Dr. Obaisi's referrals and Mr. Ryburn's follow-up visits with [UIC]." [241–12] 7. At his deposition, however, Shepard testified that Dr. Obaisi "should definitely follow Dr. Helgason's recommendation." [241–10]

13

67:1–68:2. Shephard also clarified that he had no opinion whether Obaisi breached the standard of care by not following Dr. Helgason's recommendations that Ryburn return for follow-up visits after the June 2013 and June 2015 evaluations. [241–10] 119:20–120:1, 120:12–16, 120:24–121:19.

Dr. Shephard also opined that the changes in Ryburn's MRIs from 2013 until 2019 showed "the natural progression of arthritis[.]" [241–12] 7. Shephard agreed that Ryburn's falls increased his pain and testified that any of the falls he experienced after 2012 could have worsened his condition. [257] ¶ 80.

### D. Litigation

Ryburn's amended complaint alleged that Dr. Obaisi was deliberately indifferent by failing to adequately treat Ryburn after his fall at the courthouse, order a timely MRI, send Ryburn for the follow-up neurological appointment with Dr. Helgason, and provide appropriate "care and treatment relating to his injuries that have gone untreated for over two years." [33] 13–14. He also claimed that Wexford "has a policy, practice, or custom of denying or delaying medical treatment to prisoners in an effort to save money." [33] 15.

In March 2019, and without objection by the defense [211], Ryburn filed a supplement to his complaint. [212]. The supplement, which focuses on the treatment Ryburn received between 2015 and 2019, alleged that Dr. Obaisi's and Wexford's deliberate indifference caused him further injury by "not diagnosing injuries that could have been treated years earlier, thereby sparing Mr. Ryburn of medically

14

unnecessary pain and suffering," and "exacerbating injuries that Mr. Ryburn had to live with for years." [212] 6.

## Standard of Review

A party is entitled to summary judgment only if it demonstrates that "there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material fact exists "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016). In answering this question, the Court construes all facts and draws all reasonable inferences "in favor of the party against whom the motion under consideration was filed." *Richardson v. Chi. Transit Auth.*, 926 F.3d 881, 886 (7th Cir. 2019).

## Discussion

To succeed on a claim under 42 U.S.C. § 1983, the plaintiff must prove "(1) the deprivation of a right secured by the Constitution or federal law and (2) that defendants were acting under color of state law." *Wilson v. Warren Cnty., Ill.*, 830 F.3d 464, 468 (7th Cir. 2016).

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828

(1994). A claim of deliberate indifference to an inmate's medical needs requires proof that the inmate "suffered from an objectively serious medical condition" and the defendant was "deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc).

An objectively serious medical condition is "one that a physician has diagnosed as needing treatment or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009) (internal quotation marks omitted). Deliberate indifference refers to a "sufficiently culpable state of mind," *Farmer*, 511 U.S. at 834, that exists if a prison official "*actually* knew of and disregarded a substantial risk of harm," *Petties*, 836 F.3d at 728 (emphasis in original). This "state-of-mind element is measured subjectively." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016).

### A. Claims Against Dr. Obaisi

### 1. Spinal Condition

Ryburn argues that a jury could find that Dr. Obaisi was deliberately indifferent to his degenerative spinal condition because (1) Obaisi's post-2015 referrals to UIC neurology show that he knew the proper course of treatment but disregarded it; (2) Obaisi ignored the recommendations of a specialist, Dr. Helgason; (3) Obaisi twice delayed returning Ryburn to UIC neurology; (4) Obaisi substantially departed from the standard of care in treating Ryburn; and (5) Obaisi persisted in

16

prescribing care that was ineffective and failed to prescribe Lyrica or Cymbalta. [256] 13–18.

Defendants concede that Ryburn's spinal condition is objectively serious [242] 5, but they contend that Dr. Obaisi is entitled to summary judgment because he did not display a culpable mental state. According to the defense, "all of Dr. Obaisi's treatment decisions were based on his medical judgment and all treatment fell within the applicable community standard of care." [242] 9.

I conclude, however, that a reasonable jury could find that Dr. Obaisi knew of and disregarded "an excessive risk of harm" to Ryburn's health. *Farmer*, 511 U.S. at 837. Viewed in the light most favorable to Ryburn, the evidence shows that, after his fall at the courthouse, Ryburn complained to Dr. Obaisi continually over a five-year period about neck and back pain, dizziness and lightheadedness, migraines and, eventually, numbness and weakness in his extremities. Dr. Obaisi also knew from Ryburn's first MRI that he had a degenerative spinal condition. Citing some or all of these symptoms, moreover, Dr. Obaisi recognized – on four separate occasions between January 2013 and April 2017 – that Ryburn needed to see a neurologist.

The evidence of Obaisi's deliberate indifference is clearest with respect to Ryburn's condition from 2015 to 2017.[7] When Dr. Helgason evaluated Ryburn at UIC

---

[7] According to a July 1, 2013 progress note prepared by Dr. Obaisi, Wexford approved Ryburn for a neurology "follow up" "post brain + neck MRI." [244] 8. It is unclear if this note means that Wexford approved the follow up appointment with UIC neurology that Dr. Helgason recommended, and neither side's brief relies on (or even mentions) this evidence in arguing for or against summary judgment. But even if the note reflected such approval, it would not change the outcome: a jury could view a vote by Dr. Obaisi in collegial review to authorize the follow-up appointment, followed

in June 2015, she observed that Ryburn's head and neck symptoms had worsened since his 2013 evaluation. Although Dr. Helgason recommended that Ryburn return for a follow-up evaluation in a year (and even urged that he call if he needed an earlier appointment), Dr. Obaisi did not schedule a follow-up visit, nor did he give a reason for failing to do so.

In July 2016 – shortly after when, according to Dr. Helgason, Ryburn was due for that follow-up evaluation – Ryburn experienced the first in a series of falls that continued through October of that year. Dr. Obaisi appears to have recognized the risk these falls posed to Ryburn's health because, on August 3, 2016, he referred Ryburn to UIC neurology for an evaluation of his lightheadedness. Only a few days later, however, Dr. Obaisi reversed course, cancelling the referral on the ground that Ryburn had had a "significant workup" by UIC neurology in 2013 and 2015 and did not have any "neurological deficits." [244] 36. Dr. Obaisi then referred Ryburn to UIC neurology in April 2017 in connection with Ryburn's dizziness. But Obaisi cancelled the referral again, citing Ryburn's refusal to turn over Dr. Sarlo's report and his supposed noncompliance with a neurologist in the past.

When Ryburn finally returned to UIC neurology in 2018, Dr. Maraka ordered an MRI – the first MRI taken in more than four years – and referred him to a neurosurgeon because of his herniated disc and severe spinal stenosis. Dr. Slavin recognized that Ryburn's spinal-cord compression was a longstanding problem and

---

by his failure to take any steps to ensure that the appointment occurred, as additional evidence of deliberate indifference.

performed a successful cervical discectomy to remove the herniated disc and decompress Ryburn's spinal cord.

A reasonable jury could find from these events that Dr. Obaisi knew of an excessive risk to Ryburn's health – most significantly the series of falls in 2016 and Ryburn's persistent neck and back pain – and disregarded that risk by refusing to schedule neurological evaluations that both he and Dr. Helgason had recommended.

First, Seventh Circuit cases establish "the principle that if the need for specialized expertise . . . was known by the treating physicians . . . then the obdurate refusal to engage specialists permits an inference that a medical provider was deliberately indifferent to the inmate's condition." *Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014) (internal quotation marks omitted).

Dr. Obaisi himself recognized on four occasions that Ryburn needed neurological treatment, and Dr. Helgason twice recommended that Ryburn return to UIC neurology for follow-up evaluations. But during Wexford's collegial review sessions Dr. Obaisi decided to cancel two of the referrals that he had made, and he failed to ensure that Ryburn had either of the follow-ups that Dr. Helgason had recommended. Each side's expert agreed, moreover, that there is no evidence that Obaisi exercised his medical judgment when he did not schedule the follow-ups, and even the defense expert opined that Obaisi should have followed Dr. Helgason's recommendations. In the meantime, Ryburn's back and neck pain persisted or worsened, and he began experiencing falls in his cell.

19

Second, if Dr. Obaisi had a "'cogent, medical explanation'" for his decision not to approve the referrals or schedule the follow-ups, and "if there is no evidence that this explanation is an ad-hoc rationalization, a sham, or otherwise reckless, then the evidence would not permit a jury to find deliberate indifference." *Johnson v. Estate of Obaisi*, No. 14-cv-10117, 2019 WL 4674587, *10 (N.D. Ill. Sept. 25, 2019) (quoting *Zaya v. Sood*, 836 F.3d 800, 806 (7th Cir. 2016)).

Here, however, a jury could reasonably conclude that Dr. Obaisi's reasons for cancelling the 2016 and 2017 neurology referrals were reckless, and that no reasons, cogent or otherwise, exist for the missed follow-up appointments.

Obaisi canceled the former referral because Ryburn had received a "significant workup" at UIC neurology in "2013–2015" and Obaisi did not believe that Ryburn had neurological deficits. But the 2013 and 2015 evaluations preceded what a jury could find was the most alarming of Ryburn's symptoms: his falls. No matter how significant Ryburn's prior neurological evaluations may have been, it is undisputed that they did not account for the falls that began in July 2016. And while Dr. Obaisi did not explain his conclusion that Ryburn had no neurological deficits, the record casts doubt on it: he was falling, he often felt dizzy and lightheaded, and he experienced memory issues and shooting pain radiating from his neck. Additionally, Dr. Sarlo found in November 2016 – between the denied referrals – that Ryburn had concussive damage to his brain.

As for the 2017 referral, defendants' briefs, just like Obaisi's notes, do not cite evidence showing that Ryburn had been noncompliant with a neurologist. Ryburn

20

admittedly withheld Dr. Sarlo's report (on the advice of counsel), but a jury could find that denying the neurology evaluation on that basis was a disproportionate, and deliberately indifferent, response: Dr. Obaisi made the referral without knowing the contents of Sarlo's report, and defendants cite no evidence showing that Obaisi later concluded that the evaluation was unwarranted in light of Dr. Sarlo's conclusions.

Third, a jury could find that Dr. Obaisi "engaged in a course of treatment that prolonged the ultimate surgery that [Ryburn] needed." *Almond v. Wexford Health Source, Inc.*, No. 3:15 C 50291, 2020 WL 108419, *7 (N.D. Ill. Jan. 9, 2020). As already discussed, Ryburn's neck, head, and back pain persisted or worsened from 2013 until 2018, and during that time he began having falls and feeling weakness in his extremities. While he was under Dr. Obaisi's care, however, he did not see a neurologist after 2015, nor did he have an MRI after 2013. There were also significant delays – of which Dr. Obaisi was aware – between Wexford's authorization of Ryburn's evaluations at UIC neurology and when his appointment occurred. A reasonable jury could accordingly find that, but for Dr. Obaisi's refusal to authorize Ryburn's return to UIC neurology, Ryburn's cervical stenosis would have been diagnosed earlier than 2018, and that Ryburn would have avoided needless pain and suffering that he otherwise had to endure.

The defense's argument that Dr. Obaisi "complied with the applicable standards of medical care" in treating Ryburn does not show that he is entitled to judgment as a matter of law. [265] 5.

21

Defendants contend that Ryburn did not need to return to UIC neurology after the 2013 and 2015 evaluations, given that the need for spinal surgery did not emerge until after Dr. Obaisi's death. [265] 8. Although the premise of that argument is correct, the defense's position ignores the critical fact that it was Dr. Obaisi who twice denied Ryburn permission to see a neurologist at an earlier date. As for the missed follow-up after Ryburn's June 2013 evaluation, the defense cites no evidence showing that Dr. Obaisi himself felt that the appointment was medically unnecessary, and the experts on both sides testified that, at a minimum, Obaisi should have followed Dr. Helgason's recommendation. A jury could therefore view Dr. Obaisi's failure to send Ryburn for the follow-up as evidence of Obaisi's deliberate indifference.

The defense emphasizes that Ryburn received a "significant amount of medical treatment" from Dr. Obaisi, and that Obaisi's attempts to treat Ryburn's condition in different ways show that he was not deliberately indifferent. [265] 11.

There is no question that Ryburn received an extensive amount of care from Dr. Obaisi. But "[t]he fact that a prisoner receives some medical care" – or, as this case shows, even a great deal of care – "does not, by itself, defeat a claim of deliberate indifference." *Asberry v. Wexford Health Sources, Inc.*, No. 17 C 50044, 2020 WL 30588, *3 (N.D. Ill. Jan. 2, 2020) (citing *Perez v. Fonogio*, 792 F.3d 768, 777 (7th Cir. 2015)). A factfinder must instead "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties*, 836 F.3d at 728. While trying to manage Ryburn's care over a five-year period, a jury could reasonably find, Dr. Obaisi recognized an excessive

risk of harm to Ryburn's health – posed primarily by his continual and worsening head and neck pain, dizziness and lightheadedness, and falls – but disregarded that risk by denying him the neurological treatment that even Obaisi believed was warranted.

The motion for summary judgment is therefore denied on Ryburn's claim that Dr. Obaisi was deliberately indifferent to his degenerative spinal condition.[8]

## 2. Neurological Problems

Ryburn claims that Dr. Obaisi was deliberately indifferent to his neurological problems when he canceled the referral to a neuropsychologist. [256] 19–20.

Defendants contend there is no evidence that Dr. Obaisi was "subjectively aware of a specific serious medical need or risk related to [Ryburn's] head" [242] 5, but I disagree. Ryburn told PA Williams and Dr. Obaisi that he hit his head multiple times when he fell at the courthouse. [254–3] 2–3; [257] ¶¶ 16, 19. Ryburn experienced neck and head pain, ringing in his ears, and dizziness and balance issues, and he reported these symptoms to Dr. Obaisi on many occasions. [254–3] 2–3. Dr. Obaisi's own actions in referring Ryburn to a neurologist and ordering an MRI also tend to show that Ryburn's condition was objectively serious and that Dr. Obaisi recognized it as such. *See Johnson*, 2019 WL 4674587 at *9 ("Some facts that point to a serious medical condition include: The existence of an injury that a reasonable

---

[8] Given this ruling, I need not address Ryburn's additional arguments for finding that Dr. Obaisi was deliberately indifferent, including whether Obaisi was responsible for the delays in returning Ryburn to UIC neurology and whether Obaisi should have prescribed Lyrica and Cymbalta to control Ryburn's pain.

doctor or patient would find important and worthy of comment or treatment[.]")
(internal quotation marks omitted).

On the subjective component of this claim, Ryburn argues that a jury could
find that Obaisi was deliberately indifferent because he (1) "chose an easier and less
efficacious treatment by choosing to send [him] to an on-site psychologist . . . instead
of to an outside psychologist," and (2) "failed to follow Dr. Helgason's recommendation
without any evidence he disagreed with Dr. Helgason's recommendation or, if he did,
that his disagreement was based on his medical judgment." [256] 20 (internal
quotation marks omitted).

The issue is close, but I conclude that a reasonable jury could find that Dr.
Obaisi was deliberately indifferent to Ryburn's neurological problems.

"Like other medical decisions, the choice whether to refer a prisoner to a
specialist involves the exercise of medical discretion, and so refusal to refer supports
a claim of deliberate indifference only if that choice is blatantly inappropriate[.]"
*Pyles*, 771 F.3d at 411.

A jury could reasonably find that Dr. Obaisi's decision to cancel the
neuropsychological evaluation was "blatantly inappropriate." To begin, Obaisi
initially approved Dr. Helgason's recommendation that Ryburn undergo a
neuropsychological evaluation. This shows that "the need for specialized expertise . . .
was known by" – and, indeed, accepted by – Dr. Obaisi. *Pyles*, 771 F.3d at 411. Dr.
Obaisi was not, moreover, the only doctor to recognize the need for the
neuropsychological evaluation: even the defense expert, Dr. Shephard, testified that

Obaisi should have sent Ryburn for the evaluation [241–10] 83:9-19, and this testimony could also support a finding of deliberate indifference. *See Wilborn v. Schicker*, No. 13-cv-176-SCW, 2016 WL 556746, *6 (S.D. Ill. Feb. 12, 2016) (denying summary judgment on inmate's deliberate-indifference claim where inmate's expert did not opine whether defendant doctor's failure to refer inmate to specialist breached the standard of care but testified that this failure "fell below [defendant's] ethical obligation").

Yet Dr. Obaisi canceled the referral at a collegial review session after learning that UIC's neuropsychological clinic did not accept inmate patients. There is no evidence that Dr. Obaisi tried to find a neuropsychology clinic that would treat an inmate, just as there is no evidence that Obaisi came to believe that the evaluation was no longer necessary. Taken together, this course of events could support a finding that Dr. Obaisi did not cancel the referral in the exercise of his medical judgment, but instead opted for the "easier and less efficacious treatment" of sending Ryburn to an onsite psychologist. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

Finally, Ryburn has introduced evidence that Obaisi's cancellation of the neuropsychological harmed him. According to Dr. Sarlo, a patient's neurological symptoms "potentially" can worsen "when they do not use methods to cope with those symptoms[.]" [241–13] 92:6–24. Here, by virtue of Obaisi's cancellation of the neuropsychological evaluation, Ryburn was denied access to those coping mechanisms and was thus subjected to the potential worsening of his neurological

symptoms until, as result of his settlement with the IDOC defendants, he saw Dr. Sarlo in November 2016, some ten months after the canceled referral.

To be sure, Dr. Sarlo neither estimated the likelihood that Ryburn would experience such "worsening" without better coping mechanisms nor described the severity of the "worsening" that Ryburn was (or was not) likely to experience. The perhaps speculative nature of Dr. Sarlo's opinion might lead a jury to find that Dr. Obaisi did not expose Ryburn to an excessive risk of harm by canceling the neuropsychological evaluation. But Ryburn has shown through Dr. Sarlo's testimony how a neuropsychologist could have helped him avoid further neurological problems. *Compare Montano v. Wexford Health Sources, Inc.*, No. 14 C 2416, 2018 WL 741421, *10 (N.D. Ill. Feb. 7, 2018) (granting summary judgment on inmate's claim that failure to refer him to neuropsychologist was deliberate indifference where inmate "fail[ed] to explain how a neuropsychologist would have been able to address his vision problems"). And given Dr. Obaisi's initial conclusion (as well as that of Dr. Shephard) that Ryburn needed to see a neuropsychologist, a jury must decide whether canceling that referral amounted to deliberate indifference.

The motion for summary judgment is therefore denied on Ryburn's claim that Dr. Obaisi was deliberately indifferent to his neurological problems.

### B. Claim Against Wexford

Ryburn's claim against Wexford "proceeds under the theory of municipal liability announced in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), which [the Seventh Circuit has] held applies in § 1983 claims brought against private

companies acting under color of state law." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 966 (7th Cir. 2019).

To establish liability under *Monell*, "a plaintiff must ultimately prove three elements: (1) a municipal action, which can be an express policy, a widespread custom, or an act by an individual with policy-making authority; (2) culpability, meaning, at a minimum, deliberate conduct; and (3) causation, which means the municipal action was the 'moving force' behind the constitutional injury." *Ruiz-Cortez v. City of Chi.*, 931 F.3d 592, 598 (7th Cir. 2019).

"The critical question under *Monell* . . . is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson v. Indiana Dep't of Corrs.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc).

A plaintiff can show municipal action by pointing to an express policy that "is itself unconstitutional." *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 377 (7th Cir. 2020). But if the policy at issue "is not 'itself' violative of any federal right," the plaintiff must establish that the municipality "engaged in that practice with deliberate indifference to the fact that it would lead [its employees] to violate federal law." *Ruiz-Cortez*, 931 F.3d at 598; *see also Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 406–07 (1997).

Ryburn argues that he "is a victim" of Wexford's "unreciprocal collegial review policy." [256] 17. Under this policy, Ryburn contends, Wexford must approve a Medical Director's decision to refer an inmate to an outside specialist, but Wexford

does not require such second-level review "if the Medical Director declines to refer an inmate to a specialist." [*Id.*].

According to Ryburn, Wexford knew no later than early 2015 that this policy "led to arbitrary medical decision-making[.]" [*Id.*]. Here Ryburn relies on the Lippert Report, a document "prepared by a team of experts for a federal district court in another case. It includes an audit of medical records and interviews from Stateville, as part of a general report on Illinois prisoner medical care statewide." *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 522 (7th Cir. 2019). The Lippert Report comprises two separate reports prepared by the court-appointed experts in *Lippert v. Godinez*, Case No. 10-cv-4603 (N.D. Ill.), the first issued in December 2014 and the second in the spring of 2018. [254–9, 254–10]. One of the Report's conclusions was that the approval rate at collegial review for outside treatment "varies dramatically based on which [Wexford corporate] physician happens to be receiving the phone call[.]" [256] ¶ 38. The authors also concluded that collegial review was "a barrier to timely care and should be abandoned" because "[t]he program has become a patient safety issue." [*Id.*].

Ryburn argues that the collegial review policy harmed him because "the denials of treatment from Dr. Obaisi's decisions at collegial review" caused him "unnecessary pain and suffering that could have been alleviated and by potentially causing permanent damage to his neck, back, and head." [256] 19 n.12.

Wexford's response focuses, not on whether such a policy exists or whether it caused a violation of Ryburn's constitutional rights, but on whether the policy is

sensible. [265] 15. In this vein, the company argues that "a ruling requiring Wexford to conduct a 'collegial' review every time a referral was not recommended would result in a 'collegial' review for most clinical decisions as a majority of clinical decisions do not result in specialty referrals." [*Id.*]. Wexford also contends that the Lippert Report is inadmissible hearsay [265] 14–15, but it does not respond to Ryburn's argument that the Report is admissible to show Wexford knew that a court-appointed expert had found its collegial review process to be a hazard to inmates' health.

I conclude that a reasonable jury could find in Ryburn's favor on his *Monell* claim.

First, there is no dispute that Wexford requires collegial review of a Medical Director's decision to refer a patient for outside treatment. [254] ¶ 38; [265] ¶ 38. Nor is there a dispute that collegial review does not take place if a Medical Director declines to make an outside referral. [241–4] 195:1–7.

Second, a jury could find that Wexford acted with the required degree of "culpability, meaning, at a minimum, deliberate conduct[.]" *Ruiz-Cortez*, 931 F.3d at 598.

Ryburn does not argue that the collegial review policy is itself unconstitutional, and the policy does not seem constitutionally problematic on its face. *See Whiting*, 839 F.3d at 667 (Wood, C.J., concurring in part and dissenting in part) (Wexford's collegial review process is merely "a device to obtain a second opinion" whether an inmate should see a specialist); *see also Montague v. Wexford Health Sources, Inc.*, 615 F. App'x 378, 379 (7th Cir. 2015) (noting that inmate "does not contend that

Wexford's use of 'collegial review' violates the Constitution"). Accordingly, the Court evaluates Ryburn's claim under the cases recognizing "municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights[.]" *Brown*, 520 U.S. at 407.

A jury could find that Wexford knew that collegial review threatened inmates' constitutional right to obtain adequate health care for their objectively serious medical needs, but nevertheless maintained the policy. The key predicate of such a finding is the Lippert Report, both volumes of which Wexford's corporate representative knew about shortly after their release. [241–4] 78:13–79:9.

The Lippert Report is admissible, moreover, for the non-hearsay purpose of showing that Wexford was on notice of potentially serious shortcomings with its collegial review policy, including the policy's effect on inmates' ability to obtain needed care from an outside specialist. *Hildreth v. Butler*, 960 F.3d 420, 433 (7th Cir. 2020) (Hamilton, J., dissenting) (Lippert Report "would be admissible to show corporate *knowledge* of Wexford's policy failings and of the risks that inmates faced") (emphasis in original); *Dean v. Wexford Health Sources, Inc.*, No. 17-CV-3112, 2019 WL 7041649, *2 (C.D. Ill. Dec. 20, 2019) (admitting Lippert Report at jury trial on deliberate-indifference claim "to show notice to Defendants (particularly, to Wexford) that court-appointed experts had reported systemic problems with the process for obtaining offsite diagnostic tests and offsite care, the same issues in this case"); *Boyce v. Wexford Health Sources, Inc.*, No. 15 C 7580, 2017 WL 1436963, *15 n.12 (N.D. Ill. Apr. 24, 2017) (recognizing that inmate "might have been able to use the *Lippert*

30

Report to establish knowledge that Defendant knew that the monitor had reported certain issues" but not reaching that question due to other defects in *Monell* claim).

Wexford is correct that many courts have excluded the Lippert Report on the ground that it is hearsay if offered to prove the truth of the matters asserted there. *See Wilson*, 932 F.3d at 522 (collecting cases). But I need not address that issue here because Ryburn offers the report for a non-hearsay purpose.

Wexford also insists that "[m]any of the statements made in the *Lippert* reports were not true," and that many of the accounts detailed there do not involve Dr. Obaisi. [264] ¶38. Even if that is an accurate characterization of the Report, that would not mean the Report is inadmissible. Rather, Wexford will be free to dispute the Report's accuracy and the weight it should be given as to Ryburn's claims at trial. *See Dean*, 2019 WL 7041649 at *2 (admission of Lippert Report to prove notice was not unfairly prejudicial where "Defendants were free to and did offer evidence disputing the reports' conclusions").

Third, a jury could find that the collegial-review policy itself was the "moving force" behind – and therefore caused – a violation of Ryburn's constitutional rights. *Pyles*, 771 F.3d at 409. Dr. Obaisi twice recommended neurological referrals after evaluating Ryburn in 2016 and 2017 for what a jury could find to be alarming falls and dizziness. He also referred Ryburn for an evaluation by a neuropsychologist. Yet, at collegial review sessions held shortly after the referrals were made and which Dr. Obaisi attended, Wexford refused to authorize the external referrals. In the

meantime, Ryburn's symptoms persisted or worsened, and he experienced pain and suffering that was not alleviated until his 2019 surgery.

On these facts, a jury could find that Wexford was deliberately indifferent. *E.g.*, *Southard v. Wexford Med.*, No. 17-cv-839-JPG-RJD, 2019 WL 3330237, \*6 (S.D. Ill. June 6, 2019) (denying summary judgment to Wexford on plaintiff's *Monell* claim because "a jury could find that Wexford's policy regarding collegial review for outside specialty consultations resulted in Plaintiff not being timely referred to a specialist"), *report and recommendation adopted in relevant part by Southard v. Wexford Med.*, No. 17-cv-839-JPG-RJD, 2019 WL 3322364 (S.D. Ill. July 24, 2019).[9]

The motion for summary judgment is therefore denied on Ryburn's *Monell* claim against Wexford.

## Conclusion

Defendants' motion for summary judgment [240] is denied.

ENTER:

_Heather K. McShain_
_____
HEATHER K. McSHAIN
United States Magistrate Judge

Date: 07/09/2020

---

[9] Because I find that Ryburn's *Monell* claim survives summary judgment on the collegial review policy, I need not address Ryburn's arguments that Wexford is also liable because (1) it has a policy of preferring UIC for non-emergency referrals and (2) Dr. Obaisi was a Wexford policymaker.