## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| THOMAS VON RYBURN, | |
| Plaintiff, | |
| v. | No. 14 CV 4308 |
| GHALIAH OBAISI, ET AL., | Magistrate Judge McShain |
| Defendants. | |

### MEMORANDUM OPINION AND ORDER

Pending before the Court is a second motion for reconsideration filed by defendants Ghaliah Obaisi and Wexford Health Sources, Inc. [334].[1] Although the motion was filed on behalf of both defendants, it concerns only the *Monell* claim brought against Wexford. The motion is fully briefed. [340, 341-1]. For the following reasons, the motion is granted.

### Background

This is a state prisoner's deliberate-indifference case in which the Court previously denied the defendants' motion for summary judgment. *Von Ryburn v. Obaisi*, No. 14 CV 4308, 2020 WL 3868715 (N.D. Ill. Jul. 9, 2020). The Court held that a genuine factual dispute existed as to whether Dr. Saleh Obaisi, the former medical director at Stateville Correctional Center, was deliberately indifferent to plaintiff Thomas Von Ryburn's spinal condition and neurological problems. The Court also concluded that factual disputes precluded summary judgment on plaintiff's claim under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), that Wexford itself was deliberately indifferent to his serious medical needs. More specifically, the Court held that a jury could find that Wexford's collegial review policy–according to which referrals for offsite medical care must be approved by a second doctor employed by Wexford–was a danger to prisoners' health that caused plaintiff's injuries:

> A jury could find that Wexford knew that collegial review threatened inmates' constitutional rights to obtain adequate health care for their objectively serious medical needs, but nevertheless maintained the

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings.

policy. The key predicate of such a finding is the Lippert Report, both volumes of which Wexford's corporate representative knew about shortly after their release.

The Lippert Report is admissible, moreover, for the non-hearsay purpose of showing that Wexford was on notice of potentially serious shortcomings with its collegial review policy, including the policy's effect on inmates' ability to obtain needed care from an outside specialist.

*   *   *

[A] jury could find that the collegial-review policy itself was the "moving force" behind–and therefore caused–a violation of Ryburn's constitutional rights. Dr. Obaisi twice recommended neurological referrals after evaluating Ryburn in 2016 and 2017 for what a jury could find to be alarming falls and dizziness. He also referred Ryburn for an evaluation by a neuropsychologist. Yet, at collegial review sessions held shortly after the referrals were made and which Dr. Obaisi attended, Wexford refused to authorize the external referrals. In the meantime, Ryburn's symptoms persisted or worsened, and he experienced pain and suffering that was not alleviated until his 2019 surgery.

On these facts, a jury could find that Wexford was deliberately indifferent.

*Ryburn*, 2020 WL 3868715, at *13-14 (internal citations omitted).

Because the Court concluded that plaintiff's *Monell* claim based on the collegial review policy survived summary judgment, it did not address plaintiff's arguments that Wexford was also liable under *Monell* because (1) Wexford had a policy of preferring the University of Illinois-Chicago medical center for non-emergency referrals, and (2) Dr. Obaisi was himself a Wexford policymaker. *Ryburn*, 2020 WL 3868715, at *14 n.9.

## Legal Standard

Motions to reconsider interlocutory orders, like the Court's order denying defendants' summary judgment motion, are governed by Federal Rule of Civil Procedure 54(b). *Brownlee v. Catholic Charities of Archdiocese of Chicago*, No. 16-cv-665, 2022 WL 602535, at *1 (N.D. Ill. Mar. 1, 2022). A Rule 54(b) motion serves "the limited function of correcting manifest errors of law or fact." *Id.*, at *2 (internal quotation marks omitted). The party asserting such an error "bears a heavy burden, and motions for reconsideration are not at the disposal of parties who want to rehash old arguments." *Id.* (internal quotation marks omitted). A motion to reconsider may

also be "appropriate if there has been a controlling or significant change in the law or facts since the submission of the issue to the Court." *Rodriguez v. City of Chicago*, No. 09 C 4436, 2012 WL 4795702, at *1 (N.D. Ill. Oct. 9, 2012) (internal quotation marks omitted).

## Discussion

Wexford argues that the Court should reconsider the denial of summary judgment on plaintiff's *Monell* claim in light of *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214 (7th Cir. 2021), which was decided after the Court issued its summary judgment ruling.

Like this case, *Dean* involved a *Monell* claim against Wexford based on its collegial review policy. Dean, a state prisoner, alleged that Wexford was liable for failing to timely diagnose and treat his kidney cancer. His theory was that collegial review "caused unconstitutional delays" in obtaining needed treatment, and that these delays allowed his cancer to spread and become terminal. *Dean*, 18 F.4th at 236. To prove his claim at trial, Dean introduced portions of the Lippert Reports, "two expert reports from another case that critique the medical care, and processes for medical care, that Illinois provides, through Wexford, to its prisoners." *Id.* at 221. These reports were hearsay, but "the district court allowed Dean to use them for a non-hearsay purpose: to prove that Wexford had prior notice of the experts' negative assessments of collegial review." *Id.* The jury found for Dean on the *Monell* claim and awarded him $10 million in punitive damages against Wexford, later reduced by the district court to $7 million. *Id.* at 230-31.

On appeal, however, the Seventh Circuit reversed the judgment against Wexford. Relevant to this case, the Seventh Circuit explored in depth the admissibility of the Lippert Reports, the proof needed to prevail on a *Monell* claim challenging collegial review, and whether the first Lippert Report–when admitted as "notice-only" evidence–could, standing alone, prove deliberate indifference and moving-force causation.

First, the Seventh Circuit held that the district court abused its discretion by admitting the second volume of the Lippert Report. *Dean*, 18 F.4th at 231-33. This report had been issued in October 2018, but the relevant timeframe for Dean's lawsuit was late 2015 through 2017. *Id.* at 232. Because "the findings of a 2018 report could not have put Wexford on notice regarding its actions prior to 2018 or affected Wexford's decision to maintain collegial review in 2015, 2016, or 2017," the Seventh Circuit held that the report was irrelevant to Dean's claims and therefore inadmissible. *Id.*

Second, the court of appeals expressed serious misgivings about the district court's decision to admit the first volume of the Lippert Report. *Dean*, 18 F.4th at

3

233-34. This volume had been prepared in December 2014, and it "highlighted a problem–systemic delays in medical care resulting from collegial review–that, at least at first glance, seems closely linked to the problem at the heart of Dean's lawsuit against Wexford." *Id.* at 233. But the Seventh Circuit emphasized that "the 2014 report poses significant dangers of 'confusing the issues' and 'misleading the jury'" in Dean's case:

> The 2014 report reflects the opinion of an independent court-appointed expert that collegial review causes systemic delays in medical care for Illinois inmates. In a case alleging systemic delays in medical care resulting from collegial review, telling jurors to ignore the truth of the report is somewhat "like telling jurors to ignore the pink rhinoceros that just sauntered into the courtroom."

*Id.* at 234 (quoting *United States v. Jones*, 455 F.3d 800, 811 (7th Cir. 2006) (Easterbrook, J., concurring). These dangers were present, the court added, "with or without a limiting instruction." *Id.* at 233-34. In the end, however, the Seventh Circuit concluded that it was not necessary to decide whether the 2014 report was admissible to resolve the appeal. *Id.* at 234.

Third, the Seventh Circuit held that the *Monell* claim failed on the merits because Dean failed to prove that "the policy or custom" at issue–collegial review– "demonstrates municipal fault, i.e., deliberate indifference." *Dean*, 18 F.4th at 235. Because Dean did not argue that collegial review was unconstitutional (an argument foreclosed by Seventh Circuit precedent, *see Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 659 (7th Cir. 2021)), Dean had to prove that "it was obvious" that Wexford's use of collegial review "would lead to constitutional violations and that the municipality consciously disregarded those consequences." *Dean*, 18 F.4th at 235. The court explained that "[t]his type of claim presents difficult problems of proof," *id.* at 236 (internal quotation marks omitted), because "a plaintiff seeking to hold a municipality liable for a facially lawful policy generally must prove a prior pattern of similar constitutional violations resulting from the policy." *Id.* Dean's claim failed, the Seventh Circuit held, because he "did not offer substantive evidence that collegial review had caused unconstitutional delays for other prisoners;" rather, "[h]e only offered substantive evidence of collegial review causing unconstitutional delays in his own healthcare." *Dean*, 18 F.4th at 237. The court acknowledged that there were exceptions to the rule requiring proof of a "series of constitutional violations," including for the "rare" case in which "the risk of unconstitutional consequences from a municipal policy" is "patently obvious" even without proof of prior violations. *Id.* at 236 (internal quotation marks omitted). But the Seventh Circuit held that Dean's case did not fit within that exception. *Id.*

In so ruling, the Seventh Circuit concluded that the 2014 Lippert Report– which had been admitted to establish only that Wexford was on notice of problems

with collegial review–was by itself insufficient to prove deliberate indifference. Recognizing that it had not "directly confronted this issue before," the Seventh Circuit found that its "prior cases suggest that evidence admitted only for notice cannot establish that a municipality acted with deliberate indifference unless the plaintiff also has substantive proof that the 'noticed' problems actually existed." *Dean*, 18 F.4th at 238. The court then concluded that, even if "notice-only evidence can prove deliberate indifference for *Monell* liability," the 2014 Lippert Report "falls short." *Id.* For one thing, the 2014 report did not examine collegial review at the prison where Dean had been held (Taylorville Correctional Center), "so the report could not have given Wexford notice of any specific problems occurring there." *Id.* For another, "the admitted excerpts of the report said nothing about the harm (if any) resulting from the reported delays, making it difficult to infer solely from the report that Wexford knew of any unconstitutional consequences resulting from the delays and consciously disregarded the risk of those consequences while caring for Dean." *Id.* Last, and "[m]ost critically" for the court of appeals, the 2014 Lippert Report "reviewed a materially different version of Wexford's collegial review policy." *Id.* In 2014, Wexford's collegial review policy "did not contain an exception for urgent or emergent cases." *Id.* at 239-40. But a new policy that took effect in 2016 permitted "medical directors [to] fast-track urgent or emergent cases," such that emergency referrals did not go through collegial review, and urgent cases went to collegial review the same day that the referral was made. *Id.* at 239. The Seventh Circuit accordingly found that, "even if the 2014 report gave Wexford notice that its prior policy would cause constitutional violations, it could not have given Wexford notice that its updated policy suffered from the same deficiencies." *Id.*

Finally, the Seventh Circuit held that Dean failed to prove moving-force causation because his evidence established only that collegial review was "dangerous as applied to Dean," and not that "collegial review violated the constitutional rights of other inmates." *Dean*, 18 F.4th at 239 (internal quotation marks omitted). Relying on nine of its decisions in this area, the Seventh Circuit stated that it had "repeatedly rejected *Monell* claims that rest on the plaintiff's individualized experience without evidence of other constitutional violations." *Id.* at 240. Because Dean's "proof related to the delays in care that he himself experienced," and did not establish "a pattern of similar constitutional violations or a patently obvious risk of such violations," the court reversed the judgment against Wexford on the *Monell* claim. *Id.*

### A. Propriety of Reconsideration

Plaintiff argues that Wexford's motion for reconsideration is an improper second bite at the apple that asks the Court to consider arguments that Wexford failed to raise in its summary judgment briefing. [340] 1-2. More specifically, plaintiff contends that the Court rejected two arguments raised in the pending motion when it ruled on Wexford's first reconsideration motion: whether the 2018 Lippert Report was admissible even though it post-dates the relevant events in this case, and that

the 2014 Lippert Report, standing alone, does not prove deliberate indifference. [*Id.*] 3. As plaintiff observes, the Court denied Wexford's motion because it sought reconsideration based on arguments that could have been, but were not, raised on summary judgment. [*Id.*]. Plaintiff also argues that *Dean* provides no basis for reconsideration because Wexford's arguments for why his *Monell* claim fails rest on an interpretation of *Dean* that is "unmoored from the actual holdings of that case." [*Id.*] 1.

The Court rejects plaintiff's arguments and finds that, in light of the numerous and obvious parallels between this case and *Dean*, good cause exists to reconsider the Court's earlier denial of summary judgment on the *Monell* claim.

First, the Court previously ruled that plaintiff could use the 2018 Lippert Report to prove notice because it was "a continuation of the 2014 report," and because both reports "were relevant to Wexford's notice from independent court experts that its procedures, including collegial review, caused significant and unnecessary delays in the delivery of off-site care." [293] 3 (order denying Wexford's first motion for reconsideration). This ruling cannot stand in light of *Dean*, which held that the 2018 report is irrelevant to a *Monell* claim based on events that predate the report's publication. *Dean*, 18 F.4th at 232-33. Given that the denial of summary judgment depended on the 2018 Lippert Report, the Court is obligated to reconsider that decision in light of *Dean*.

Second, *Dean* emphasizes that a *Monell* claim directed at a facially lawful policy ordinarily cannot succeed unless the plaintiff introduces "substantive evidence of a pattern or practice of similar violations." *Dean*, 18 F.4th at 237. Despite Wexford's inexplicable failure to argue that point at summary judgment, the Court concludes that reconsideration is nevertheless appropriate. *Dean* is a binding decision from the Seventh Circuit in which the court considered the identical *Monell* claim that plaintiff presses here, and the case was not decided until after the Court denied Wexford's motion for summary judgment. In addition, considerations of judicial efficiency weigh in favor of reconsideration. Although Wexford did not argue at summary judgment that the *Monell* claim failed based on the absence of evidence that other prisoners were harmed by the collegial review policy, it is clear after *Dean* that a prisoner who fails to introduce such evidence–including the plaintiff in this case–is extremely unlikely to prevail on his *Monell* claim. *See id.* at 240 ("Consistent with the Supreme Court's guidance, we have repeatedly rejected *Monell* claims that rest on the plaintiff's individualized experience without evidence of other constitutional violations."). To permit the claim to proceed to trial when, as discussed below, it cannot survive summary judgment would waste judicial resources and needlessly consume jurors' time when the trial of this case begins.

The pending reconsideration motion thus presents an entirely different situation than the defense's first motion to reconsider. That motion was ostensibly

based on a Seventh Circuit decision that was decided after summary judgment briefing concluded, but before the Court ruled on the motion. As the Court explained, however, that decision broke no new ground and simply "applied well-settled law, including rules from cases that this Court cited in its opinion" denying summary judgment, respecting expert testimony in deliberate-indifference cases. [293] 1. Defendants then argued that the Court manifestly erred by denying summary judgment on the *Monell* claim because "plaintiff failed to offer sufficient evidence to prove that a *Monell* violation occurred." [*Id.*]. The Court disagreed that reconsideration was warranted because "none of the many arguments that defendants make to support these points was raised in their summary judgment briefs." [*Id.*]. In contrast, the pending motion is based on an intervening Seventh Circuit decision that not only demonstrates that the Court erred in ruling that the 2018 Lippert Report was admissible, but also discusses at length the kind of evidence that a plaintiff must introduce to prevail on the exact *Monell* claim that is at issue in this case.

For these reasons, the Court concludes that it should reconsider the denial of summary judgment on plaintiff's *Monell* claim.

### B. *Monell* Claim: Collegial Review

Wexford argues that it is entitled to summary judgment on plaintiff's *Monell* claim based on collegial review. After *Dean*, Wexford contends, the 2018 Lippert Report is not relevant to plaintiff's claim because the events underlying the claim occurred before that report was published. [334] 5. Wexford also contends that *Dean* requires plaintiff to introduce substantive evidence that collegial review caused violations of other prisoners' constitutional rights, and that plaintiff's claim necessarily fails because he has offered no such evidence. [*Id.*] 3, 5-6. Finally, Wexford argues that the 2014 Lippert Report is inadmissible to prove that Wexford was on notice of serious problems with collegial review and, in any event, insufficient to prove deliberate indifference or moving-force causation. [*Id.*] 6.

### 1. The 2018 Report Is Inadmissible

First, the Court agrees with Wexford that the 2018 Lippert Report is not admissible for any purpose because, as in *Dean*, the report post-dates the relevant events underlying plaintiff's collegial review claim. As explained in the order denying summary judgment, plaintiff's evidence established that he was denied a referral for outside care following collegial review sessions in January 2016, August 2016, and April 2017. *See Ryburn*, 2020 WL 3868715, at *4-5. Under *Dean*, the 2018 report is not relevant to this claim. *See Dean*, 18 F.4th at 232 ("the findings of a 2018 report could not have put Wexford on notice regarding its actions prior to 2018 or affected Wexford's decision to maintain collegial review in 2015, 2016, or 2017").

In a footnote, plaintiff suggests that *Dean* is distinguishable because he "continued to suffer harm from Wexford's failure to provide care through at least November 2018," after the second volume of the Lippert Report was published in October 2018. [340] 3 n.2. However, plaintiff cites no evidence that he was denied necessary medical care at a collegial review session that occurred after April 2017. *Dean* is therefore controlling on this issue, and the Court may not consider the 2018 Lippert Report. *See Ledesma v. Marriott Int'l, Inc.*, No. 18-cv-3947, 2020 WL 6747005, at *4 (N.D. Ill. Nov. 16, 2020) ("The Court can consider only admissible evidence at the summary judgment stage.").

## 2. Evidence of Collegial Review Harming Other Prisoners

Second, the Court disagrees that plaintiff cannot prevail on his *Monell* claim respecting collegial review without introducing evidence that collegial review caused other prisoners to experience unconstitutional delays in, or denials of, needed medical care. The failure to introduce such evidence does, however, represent a significant blow to a prisoner's *Monell* claim challenging a facially lawful policy like collegial review, because the prisoner can prevail only if he shows that his case "is one of the 'rare' cases where the risk of unconstitutional delays is 'patently obvious,' even without proof of other violations." *Dean*, 18 F.4th at 237 (quoting *Connick v. Thompson*, 563 U.S. 51, 64 (2011)).

Throughout its reconsideration motion, Wexford insists that *Dean* held that "evidence admitted only for notice," such as the Lippert Report, "cannot establish that a municipality acted with deliberate indifference ***unless the plaintiff also has substantive proof that the 'noticed' problems actually existed.***" [334] 1, 3, 5 (emphasis in original). Because plaintiff "has not provided any evidence regarding other prisoners and has only offered evidence of his own healthcare," Wexford maintains that plaintiff's *Monell* claim fails regardless of whether the 2014 Lippert Report is admissible. [*Id.*] 6.

Wexford's reading of *Dean* overstates what the Seventh Circuit said regarding evidence of other prisoners' experiences with collegial review. Rather than holding that such evidence is an absolute requirement whenever a plaintiff seeks to impose *Monell* liability based on collegial review, the Seventh Circuit stated that its "prior cases *suggest* that evidence admitted only for notice cannot establish that a municipality acted with deliberate indifference unless the plaintiff also has substantive proof that the 'noticed' problems actually existed." *Dean*, 18 F.4th at 238 (emphasis added). Earlier in the decision, moreover, the Seventh Circuit explained that a plaintiff challenging a facially lawful policy "*generally* must prove a prior pattern of similar constitutional violations resulting from the policy." *Id.* at 236 (emphasis added). That the Seventh Circuit did not impose an absolute requirement that a "prior pattern of similar constitutional violations resulting from the policy" be proved in every case challenging a facially lawful policy is also apparent from the

court's statement that there are "limited exceptions to this rule," such as for those "'rare' cases" in which "the risk of unconstitutional consequences from a municipal policy 'could be so patently obvious that a municipality could be liable under § 1983 without proof of a pre-existing pattern of violations.'" *Id.* at 236 (quoting *Connick v. Thompson*, 563 U.S. 51, 64 (2011)). Finally, as plaintiff also observes, a ruling that a *Monell* claim challenging a facially lawful policy cannot succeed without evidence of other constitutional violations would be in tension with *Glisson v. Indiana Dep't of Corrs.*, 849 F.3d 372 (7th Cir. 2017) (en banc). In *Glisson*, the Seventh Circuit said that:

> Notably, neither the Supreme Court in *Harris*, nor the Ninth Circuit, nor the Third Circuit, said that institutional liability was possible only if the record reflected numerous examples of the constitutional violation in question. The key is whether there is a conscious decision not to take action. That can be proven in a number of ways, including but not limited to repeated actions. A single memo or decision showing that the choice not to act is deliberate could also be enough.

*Glisson*, 849 F.3d at 381.

For these reasons, the Court concludes that the failure by a plaintiff seeking to impose *Monell* liability based on a facially lawful policy to introduce evidence that the policy has caused constitutional deprivations for others is not, standing alone, fatal to the *Monell* claim.

That said, the importance of introducing evidence of prior constitutional violations attributable to the facially lawful policy cannot be overstated. *Dean* discusses the importance of this evidence at length, and the Seventh Circuit's decision reversing the judgment against Wexford repeatedly highlighted Dean's failure to prove that collegial review had harmed other prisoners. *See Dean*, 18 F.4th at 237 ("Dean did not introduce any substantive evidence of a pattern or practice of similar violations. He did not offer substantive evidence of collegial review causing unconstitutional delays for other prisoners."); *id.* at 239-40 (discussing witnesses' failure to address whether "collegial review violated the constitutional rights of other inmates"). This evidence is critical to a *Monell* claim because "a prior pattern of similar violations puts the municipality on notice of the unconstitutional consequences of its policy" and "may show that the policy itself, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the moving force behind the plaintiff's injury." *Dean*, 18 F.4th at 236.

Here, plaintiff has not offered evidence that collegial review violated the constitutional rights of other inmates. Plaintiff cannot prevail on his *Monell* claim or avoid summary judgment unless a rational jury could find that plaintiff's only

evidence—the 2014 Lippert Report admitted as "notice-only" evidence—proves deliberate indifference. For the reasons set forth below, the Court concludes that no rational jury could find for plaintiff.

### 3. Sufficiency of the Lippert Report

Third, as in *Dean*, it is unnecessary to decide whether the 2014 Lippert Report is admissible for notice purposes. Even assuming that the report is admissible, and that notice-only evidence can prove deliberate indifference, the Court holds that a rational jury could not conclude that the report proves either municipal fault or moving-force causation.

### i. Relevant Conclusions of the 2014 Lippert Report

Plaintiff submitted the 2014 Lippert Report along with his opposition to the defendants' motion for summary judgment. *See* [254-9]. Two parts of the report are relevant to the Court's analysis. First, in a section of the report entitled "Scheduled Offsite Services (Consultations and Procedures)," the authors of the report discuss Wexford's practices at several Illinois prisons–including Stateville, where plaintiff was housed–for (1) identifying the need for offsite care, (2) reviewing referrals for offsite care at weekly collegial review sessions, (3) the scheduling of offsite care if a referral is approved at collegial review, and (4) follow-up care after the prisoner receives offsite care and returns to the prison. [*Id.*] 30-31. After describing the mechanics of collegial review, the authors highlighted the following system-wide concerns:

- "[T]he rate of approval [at collegial review for offsite treatment] varies dramatically based on which [offsite Wexford] physician happens to be receiving the phone call."

- "For Dixon and Stateville, despite verbal approval received over the telephone, there is a substantial delay in [Wexford] providing the authorization to the University of Illinois," where most offsite care is provided. "This delay can extend up to eight weeks or more."

- "During our review of records, we found breakdowns in almost every area, starting with delays in identification of the need for offsite care, delays in obtaining an authorization number, delays in being able to schedule an appointment timely, delays in obtaining offsite paperwork and delays or the absence of any follow-up visit with the patient."

- "[A]lthough some of the facilities were tracking these steps fairly conscientiously, others were not, creating much less dependable outcomes."

[254-9] 30.

The report then discussed several individual cases in which the authors observed delays in identifying a prisoner's need for offsite treatment, obtaining offsite treatment in timely fashion, and following-up after offsite treatment uncovered an abnormal result. *See* [254-9] 30-32. However, none of these cases occurred at Stateville Correctional Center. *See* [*id.*].

Second, the 2014 Lippert Report contains a Stateville-specific appendix, in which the authors observed that "scheduled offsite services reflect persistent problems with the timeliness of access to these services or problems with follow-up once the service is provided." [254-9] 53. The authors then reviewed nine cases in which a prisoner had been scheduled for an offsite appointment or procedure regarding "the appropriateness and timeliness of the request as well as the timeliness of the service and the appropriateness of the follow up onsite." [*Id.*] 71. In six of the cases, the authors found problems that consisted mainly of the failure to provide appropriate follow-up care on the inmate's return to Stateville and to maintain adequate records of treatment that the inmate had received. *See* [*id.*] 71-72.

## ii. Analysis

When admitted for notice purposes, the contents of the 2014 Lippert Report would not permit a rational jury to find that Wexford was deliberately indifferent or that collegial review was the moving force behind any deprivation of plaintiff's Eighth Amendment rights.

Most importantly–and as was true in *Dean*–nothing in the 2014 Lippert Report speaks to "the harm (if any) resulting from the reported delays" caused by Wexford's use of collegial review, "making it difficult to infer solely from the report that Wexford knew of any unconstitutional delays and consciously disregarded the risk of those consequences while caring" for plaintiff. *Dean*, 18 F.4th at 238.

To be sure, the 2014 report is no ringing endorsement of collegial review. Its authors determined, for example, that the identity of the Wexford doctor conducting the review–rather than the inmate's medical needs–determined whether a referral for offsite care would be approved. It is also possible to view the report as concluding that delay–even repeated and lengthy delays–is the defining feature of collegial review. But the fact remains that the "collegial review process is not unconstitutional on its face," *Howell*, 987 F.3d at 659, and "Wexford's knowledge that some referrals slipped through the cracks is not the same as Wexford's knowledge that constitutionally necessary referrals were not happening with such frequency that it ignored an obvious risk of harm." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 967 (7th Cir. 2019). The individual case studies discussed in the Stateville-specific appendix would not permit a jury to find that Wexford knew that delays, even

repeated and lengthy delays, were causing violations of inmates' Eighth Amendment rights. This is because the principal problems identified in the case studies were inadequate follow-up care after an offsite appointment and inadequate record-keeping. *See* [254-9] 70-71 ("there is no report in the chart" respecting inmate's appointment for vascular surgery consult, and "there has been no follow up"); [*id.*] 71 ("no physician follow up" after ENT consult and "no orders written consistent with the ENT recommendations); *id.* ("no follow up . . . by a physician" after inmate's appointment at "vascular lab"); *id.* (no follow up notes or orders after inmate's referral to "ortho"); [*id.*] (inmate's prostate cancer "did not appear on his problem list," no physician follow up after "GU appointment," and no report from CT scan); [*id.*] ("no follow up of any kind" after referral to general surgeon who recommended right inguinal hernia robotic repair). Not one of the case studies identified an inmate who was harmed–let alone subjected to deliberate indifference to his serious medical needs–by the delays caused by the need to obtain approval for an offsite referral at collegial review or the delay between approval of the referral and the actual scheduling of the appointment. Underscoring the lack of probative value in these conclusions is plaintiff's failure to cite any specific portion of the Lippert Report to support his claim that Wexford knew that the risks of harm from maintaining collegial review were patently obvious. *See* [340] 5.

For these reasons, the Court concludes that no reasonable jury could find that Wexford knew that collegial review posed a significant risk of harm to inmates but consciously disregarded that risk and maintained the policy. For similar reasons, the Court concludes that a jury could not find that collegial review was the moving force behind any violation of his Eighth Amendment rights. There is no evidence that other prisoners were harmed by collegial review, and the Lippert Report does not permit a reasonable inference that Wexford knew that the delays associated with, or inherent to, collegial review were harming other inmates. Despite the shortcomings of the Lippert Report, plaintiff contends that a jury could still find that his is the rare case where a facially lawful policy like collegial review "would obviously give rise to the risk that an inmate would not receive necessary specialized care that could only be provided offsite." [340] 9-10. In support, plaintiff claims that a jury "would be particularly warranted in drawing this conclusion in light of the evidence that Mr. Ryburn did, in fact, experience significant delays in receiving necessary offsite care as a result of the policy, leading to the worsening of his condition." [*Id.*] 10. But this argument begs the critical question at the heart of plaintiff's *Monell* claim: are plaintiff's injuries attributable to collegial review itself, or were his injuries caused by a negligent, one-time administration of collegial review by Dr. Obaisi and the Wexford physicians who worked plaintiff's case? Without pattern or practice evidence, and with no basis in the Lippert Report for concluding that delays caused by collegial review were injuring other prisoners, the jury could find for plaintiff only by speculating or deviating from the rigorous standards that control *Monell* claims.

Finally, the Court recognizes that plaintiff was denied offsite care at three collegial review sessions held in January 2016, August 2016, and April 2017. *Ryburn*, 2020 WL 3868715, at *4-5. As the Seventh Circuit explained in *Dean*, a new collegial review policy took effect on January 14, 2016 (the same date as the first denied referral in plaintiff's case) that exempted emergency cases from collegial review and required that urgent cases be heard at collegial review on the same day that the referral was made. *See Dean*, 18 F.4th at 238-39. In *Dean*, the Seventh Circuit gave significant weight to the fact that Dean was treated while this policy was in effect, finding that "[t]he exception for urgent or emergent cases . . . is directly responsive to the possibility that collegial review might cause harmful delay in these cases." *Id.* at 239. Despite the "critical[ ]" role that the new policy played in *Dean*, here Wexford does not discuss the policy or argue that it favors granting summary judgment. But even assuming that plaintiff's referrals were evaluated at collegial review sessions that were operating under the older policy (which did not make exceptions for urgent and emergent cases), the Court still concludes that a rational jury could not find for plaintiff. For the reasons discussed above, the Lippert Report, when considered as "notice-only" evidence, is not sufficient to permit a rational jury finding of deliberate indifference, moving-force causation, or that plaintiff's case is the exceptional one where the risk of harm is so patently obvious, such that the need for pattern or practice evidence is obviated.

The Court therefore grants Wexford's motion for summary judgment on plaintiff's *Monell* claim challenging collegial review. The Court will now address plaintiff's two other *Monell* claims, which the Court did not reach in its original summary judgment decision.

### C. *Monell* Claim: UIC Referral Policy

Plaintiff argues that a reasonable jury could find Wexford liable under *Monell* based on its "policy of relying on UIC [the University of Illinois-Chicago Medical Center] to the exclusion of other facilities for non-emergent offsite care[.]" [340] 7. Plaintiff notes that Wexford's contract with the Illinois Department of Corrections (IDOC) allows Wexford doctors to "refer patients to UIC (and no other facilities) without prior approval from IDOC, and further provides that Wexford's compensation can be adjusted if it overutilizes offsite services." [254] 17, at ¶ 39. Plaintiff also observes that Wexford's Rule 30(b)(6) witness, Dr. Neil Fisher, testified that "whether UIC is willing to see [an inmate for offsite care] or not" "may be a factor" in whether the inmate "gets outside treatment[.]" [241-4] 29, at 112:21-113:2. According to plaintiff, Fisher testified that Wexford "permits its clinicians to cancel referrals if UIC is unable to see an inmate even if the inmate's condition has not improved." [254] 9. Plaintiff also contends that Fisher testified that Wexford was aware between 2014 and 2018 that inmates often did not receive offsite care due to the failure to secure appointments at UIC, *see* [340] 8, and that Wexford was aware that there were delays in obtaining appointments at UIC:

13

[T]here can be challenges with scheduling appointments. UIC has -- some of the specialists are particularly challenging to get into. So we recognize that there are wait times for some of these clinics.

So again, the medical director would be aware of the wait times and this is often discussed at time of collegial review conference call. In reference to Wexford corporate is aware, Wexford corporate, meaning UM [i.e., utilization management], is aware of the wait times for these, and whether we would consider that acceptable is part of the approval process if we're sending someone to UIC.

[241-4] 17, at 64:4-16.

Finally, plaintiff argues that "the 2014 Lippert Report put Wexford on notice of the problems caused by its reliance on UIC, and in particular that in certain instances UIC could not 'provide access for up to three or more months.'" [340] 7-8 (quoting [254] 17, at ¶ 39).

Wexford argues that plaintiff's *Monell* claim based on the UIC referrals fails for the same reasons as plaintiff's collegial review claim. [334] 6-7. Because plaintiff does not contend that Wexford's policy of referring inmates to UIC for non-emergent care is unconstitutional on its face, Wexford maintains that plaintiff must prove a pattern or practice of prior constitutional violations attributable to the UIC referral policy. [*Id.*] 6. Wexford then argues that, because plaintiff has no such evidence, plaintiff's claim depends entirely on the 2014 Lippert Report. Because this evidence is, standing alone, insufficient to prove deliberate indifference, Wexford argues that it is entitled to summary judgment.

Plaintiff responds that "the law does not require such additional evidence about others' care," and that the Lippert Report is admissible to prove that Wexford was on notice of the problems of excessively relying on UIC for offsite referrals. [340] 8. Plaintiff also contends that Dr. Fisher's testimony establishes that "Wexford's policy of relying on UIC threatened the constitutional rights of other inmates who needed outside care." [*Id.*].

The Court concludes that plaintiff's claim based on the UIC referrals should be evaluated under the same framework that applied to the collegial review claim. Plaintiff does not contend that Wexford's policy of referring non-emergent cases to UIC is facially unconstitutional. *See* [256] 22-33; [340] 7-9. Accordingly, plaintiff's claim must proceed as a claim seeking to impose "municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 407 (1997). And plaintiff "generally must prove a prior pattern of similar constitutional violations resulting from the policy." *Dean*, 18 F.4th at 236.

14

Here, plaintiff's proof does not permit a jury to find that Wexford was deliberately indifferent. First, contrary to plaintiff's contention, there is no pattern or practice evidence in the record showing that Wexford's UIC referral policy harmed other prisoners–let alone evidence that Wexford was aware of this but consciously disregarded the risk of harm posed to inmates. Plaintiff asserts that Dr. Fisher, Wexford's corporate representative, testified that Wexford "permits its clinicians to cancel referrals if UIC is unable to see an inmate even if the inmate's condition has not improved." [254] 17-18, at ¶ 39 (citing [241-4] 30, at 116:8-117:16). But the cited portion of Fisher's deposition transcript does not support this assertion. Fisher instead testified that, if a referral to UIC had been canceled despite no "change" in the inmate's condition, Wexford clinicians would "rediscuss[ ]" the inmate's case, "notat[e] . . . why something is a change of plan of care," and even develop "an alternative plan of care":

> Q:   So the medical director in combination with another physician employed by Wexford may in a certain circumstance decide that a patient who had been previously referred to UIC but UIC was unable or unwilling to treat, no longer needed specialty care and so the referral will be canceled.
>
> A:   In a hypothetical case, that is a potential. But of course the case would be rediscussed and then there would be notations of why something is a change of plan of care.
>
> Q:   Okay. But if the condition had -- if a patient's condition had not changed materially, would it be appropriate to still cancel the referral?
>
> A:   That's why we have clinicians involved with making a decision. So clinician's making a clinical decision. So without knowing all of the specifics, it's impossible to know what individual clinicians would do. But that's why we talk about these cases.
>
> So it's not just a faxing back and forth of paperwork. It's discussing the case. And clinicians can look at the case differently and they can come up with a plan of care. But it may be an alternative plan of care than what was initially decided.
>
> Q:   Even if the patient's condition had not changed.
>
> A:   Again, even if the patient's condition may not have changed, there may be a reason for the clinical decision to be made that changes.

[241-4] 30, at 116:8-117:16 (objections by Wexford's counsel omitted).

This testimony would not permit a reasonable jury to draw the inference plaintiff wants it to draw–namely, that Wexford lets inmates linger without care if a referral to UIC is canceled. If anything, Fisher's testimony suggests that a canceled referral would cause Wexford clinicians to reevaluate the case and decide on appropriate next steps. It is therefore "difficult to infer" from this testimony that "Wexford knew of any unconstitutional consequences and consciously disregarded the risk of those consequences while caring for" plaintiff. *Dean*, 18 F.4th at 238. Indeed, the Seventh Circuit has held that neither an inmate's own testimony, nor that of an onsite medical director or of Dr. Fisher "admitting awareness that referrals to UIC were sometimes never scheduled or, if scheduled, significantly delayed, is enough to establish that Wexford was deliberately indifferent to [an inmate's] serious medical needs." *Walker*, 940 F.3d at 967.

Second, even assuming that the Lippert Report is admissible as "notice-only" evidence, and that notice-only evidence can prove *Monell* liability, the conclusions set forth there respecting the UIC referral policy do not permit a finding that Wexford knew that this policy was harming inmates. Again, the Court recognizes that the Lippert Report has little, if anything, good to say about Wexford's reliance on UIC for the primary locus of offsite referrals. The authors instead concluded that this policy regularly caused "extraordinary delays" in providing offsite care that could have been avoided "by using a local service" closer to the prisons at issue. [254-9] 30. But the relevant question is not whether the UIC referral policy is a good one; it is "whether the municipal policy reflects a conscious disregard for a known or obvious risk of the constitutional deprivation." *Dean*, 18 F.4th at 237. Nothing in the Lippert Report speaks to "the harm (if any) resulting from the reported delays" associated with the UIC referral policy, "making it difficult to infer solely from the report that Wexford knew of any unconstitutional delays and consciously disregarded the risk of those consequences while caring" for plaintiff. *Id.* at 238. In other words, even though the Lippert Report could support a jury's finding that Wexford knew that the UIC referral policy caused frequent and unjustified delays, that "is not the same as Wexford's knowledge that constitutionally necessary referrals were not happening with such frequency that it ignored an obvious risk of serious harm." *Walker*, 940 F.3d at 967.

Nor, finally, does the evidence support a finding that plaintiff's case is the rare one in which the risk of harm of relying on UIC for non-emergent referrals was so patently obvious as to establish that Wexford was deliberately indifferent. Plaintiff's contention that the jury could draw that conclusion because "the policy directly resulted in [him] not receiving clinically indicated offsite care–a neuropsychology evaluation–after Dr. Obaisi learned it could not take place at UIC" again assumes an answer to the critical issue in the case: whether it was the UIC referral policy itself, or a potentially negligent one-time administration of the policy by Dr. Obaisi and other Wexford doctors, that caused his injury. [340] 10. In any event, the document memorializing the cancellation of plaintiff's referral to UIC states that Obaisi and Dr. Ritz (a Wexford physician) agreed that plaintiff would "see onsite psych" in lieu of the

16

neuropsychologist, and that Obaisi would "represent [the] case" if needed. [244] 36. This evidence is consistent with Dr. Fisher's testimony that, in the event a referral to UIC were canceled, the Wexford clinicians would review the case and decide on an alternative treatment plan. A reasonable jury could not infer that the UIC referral policy posed a patently obvious risk of harm when that policy also allowed Wexford to reevaluate the case and develop alternative treatment plans.

For these reasons, the Court concludes that Wexford is entitled to summary judgment on plaintiff's *Monell* claim based on the policy of preferring UIC for non-emergent offsite care.

### D. *Monell* Claim: Dr. Obaisi as a Wexford Policymaker

Finally, the Court turns to plaintiff's claim that Wexford is liable under *Monell* because Dr. Obaisi was "Wexford's final policymaker with respect to clinical treatment at Stateville." [256] 23.

### 1. Parties' Arguments

To show that Dr. Obaisi was a policymaker with authority over all aspects of clinical care at Stateville, plaintiff relies on a provision in the contract between Wexford and IDOC stating that a prison's onsite medical director "shall serve as the medical authority" at the prison and "shall plan, implement, direct and control all clinical aspects of the medical and mental health program." [254] 18, at ¶ 40. Plaintiff also observes that, while Wexford maintains a "Policies and Procedures" handbook, Dr. Fisher testified that "these are not 'policies' in any meaningful sense" because clinicians "may choose a different direction," and the policies represent only "clinical pathways that our clinicians may or may not use." [256] 23-24; [254] 18, at ¶ 40. Finally, plaintiff observes that a physician's assistant at Stateville, LaTonya Williams, testified that she does not follow Wexford's policies and procedures, and that the medical director–*i.e.*, Dr. Obaisi–was "ultimately responsible for the medical care of the inmates at Stateville." [256] 24; *see also* [241-2] 25, at 95:21-96:4 (Williams's deposition).

Wexford's summary judgment briefs argued only that the *Monell* claim should fail because "the care that Plaintiff received from Dr. Obaisi . . . does not give rise to a constitutional violation." [265] 17 (emphasis in original). This argument necessarily fails in light of the Court's ruling that a reasonable jury could find that Dr. Obaisi was deliberately indifferent to his spinal condition and neurological problems. *See Ryburn*, 2020 WL 3868715, at *7-11. In the pending reconsideration motion, Wexford makes two new arguments. First, it contends that the Seventh Circuit has held that, while "site medical directors, like Dr. Obaisi, may have had the final say in an inmates' [*sic*] treatment plan and were thus the final decisionmaker with respect to care," such evidence does not prove that the medical director was a final policymaker

for *Monell* purposes. [334] 7. Second, and relying on *Dean*, Wexford argues that plaintiff cannot prevail on this *Monell* claim without "evidence regarding other prisoners." [*Id.*].

## 2. Legal Standard

*Monell* liability may be imposed on Wexford if plaintiff introduces "evidence that an official with final policy-making authority acted for the corporation." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016) (internal quotation marks omitted). To prevail under this theory, plaintiff must prove that "an actor with final decision-making authority within the entity adopted the relevant policy or custom." *Thomas v. Martija*, 991 F.3d 763, 774 (7th Cir. 2019). A court's "inquiry is not whether an official is a policymaker on all matters for the municipality, but whether he is a policymaker in a particular area, or on a particular issue." *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009) (internal quotation marks omitted).

"[S]imply because a municipal employee has decisionmaking authority, even unreviewed authority, with respect to a particular matter does not render him a policymaker as to that matter." *Ball v. City of Indianapolis*, 760 F.3d 636, 643 (7th Cir. 2014). Rather, "[a] municipality must have delegated authority to the individual to make policy on its behalf." *Id.* "Whether a public official has final policymaking authority often turns on whether his decisions are subject to review by a higher official or other authority." *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011). To determine whether an individual has "policymaking authority on any particular policy decision," a court should consider "(1) lack of constraints by policies made by others; (2) lack of meaningful review; and (3) a grant of authority to make the policy decision." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 468 (7th Cir. 2010) (internal quotation marks, brackets, and emphasis omitted).

Nothing in these cases or in *Dean* supports Wexford's argument that plaintiff cannot prevail on his official policymaker claim unless he introduces evidence that other prisoners were harmed by Dr. Obaisi's treatment of them or by the policies he allegedly enacted. As the Seventh Circuit explained in *Dean*, there are three types of municipal action that can give rise to municipal liability under § 1983: (1) an express policy or custom that causes a constitutional violation when enforced; (2) a widespread practice that is so widespread as to constitute a municipal policy or custom; and (3) "an allegation that the constitutional injury was caused by a person with final policymaking authority." *Dean*, 18 F.4th at 235. *Dean* did not address the policymaker theory at issue in this *Monell* claim, and the court's discussion of pattern or practice evidence relates only to *Monell* claims alleging that a facially lawful policy caused a violation of a plaintiff's constitutional rights.

### 3. Analysis

The Court concludes that a reasonable jury could not find that Dr. Obaisi was a Wexford policymaker.

First, the Seventh Circuit has twice rejected claims that Wexford's on-site medical directors qualify as final policymakers for purposes of *Monell* liability. In *Whiting*, the court affirmed a grant of summary judgment to Wexford on a prisoner's claim that the onsite medical director of Shawnee Correctional Center, Alfonso David, was a Wexford policymaker. 839 F.3d at 664. The evidence showed that Dr. David had treated the prisoner several times, submitted biopsy requests to Wexford's collegial review committee, participated in at least one of the collegial review sessions at which the requests were discussed, and ultimately referred the prisoner to an outside oncologist. *Id.* at 660. Based on this evidence, the Seventh Circuit held that "Dr. David did not have final policymaking authority in the relevant sense." *Id.* at 664. The court acknowledged that David "may have had the final say on Whiting's treatment plan and thus was the final *decision-maker* with respect to his care," but the court concluded that "that's not nearly enough to show he was the final *policymaker*." *Id.* (emphases in original).

In *Thomas*, the prisoner brought deliberate indifference claims against, *inter alia*, Dr. Obaisi and Wexford in connection with a delay in medical treatment that occurred when he was transferred from one prison to another. 991 F.3d at 766. Although the Seventh Circuit held that there was a triable factual issue on the individual claim against Obaisi, the court rejected the claim that "Dr. Obaisi was the final policymaker for Stateville." *Thomas*, 991 F.3d at 774. "Nothing in the record supports a finding that an institution-level medical director sat at the apex of authority for Wexford's transfer policy," the Seventh Circuit found, just as "[t]here is no evidence supporting the counter-intuitive idea that Wexford, the corporation, has as many 'final' decisionmakers as it has prisons." *Id.* (some internal quotation marks omitted).

Second, after *Whiting*, many district court decisions have rejected claims that a prison's onsite medical director qualified as a final policymaker. *See Carter v. Wexford Health Sources, Inc.*, Case No. 19-cv-63-DWD, 2021 WL 3886620, at *5 (S.D. Ill. Aug. 31, 2021) ("Dr. David, however, as the medical director did not have final policymaking authority as contemplated by *Monell* and its progeny."); *Flournoy v. Estate of Obaisi*, No. 17 CV 7994, 2020 WL 5593284, at *14 (N.D. Ill. Sept. 18, 2020) (rejecting claim that Obaisi was final policymaker where evidence showed "Obaisi was following directives from his bosses at Wexford, not creating the policy himself"); *Pyles v. Shearing*, Case No. 3:13-CV-770-NJR-MAB, 2019 WL 4307307, at *12 (S.D. Ill. Aug. 21, 2019) ("First, as medical director, Dr. Shearing may have had the final say on whether to submit a referral request for an inmate and was thus . . . the final decision-maker with respect to referrals but that's not nearly enough to show he was

the final policymaker."), *report and recommendation adopted*, 2019 WL 4305496 (S.D. Ill. Sept. 11, 2019); *Ambruster v. Shah*, Case No. 3:16-CV-544-SMY-MAB, 2019 WL 5874335, at *19-20 (S.D. Ill. Jul. 23, 2019) (medical director at Southwestern Illinois Correctional Center was not *Monell* policymaker where evidence showed that director "was, at best, a mid-level employee in the Wexford corporate hierarchy," "subject to supervision by the regional medical director," and "was expected to follow" Wexford's "myriad corporate policies, procedures, and expectations"), *report and recommendation adopted*, 2019 WL 4200601 (S.D. Ill. Sept. 5, 2019).

Plaintiff contends that his case is distinguishable from these cases because none of them addressed the significance of the contractual language identifying Dr. Obaisi as "the medical authority" at Stateville who had power to "plan, implement, direct and control all clinical aspects of the medical and mental health program." [254-11] 21. But one case, *Jones v. Aguinaldo*, Case No. 10 C 313, 2015 WL 1299284 (N.D. Ill. Mar. 19, 2015), held that the identical language did not create a jury issue as to whether a previous Stateville medical director, Dr. Ghosh, was a Wexford policymaker. In *Jones*, a prisoner brought a deliberate-indifference claim against Ghosh in his individual capacity and a *Monell* claim against Wexford on the theory that Ghosh was a final policymaker when it came to issuing specialist referrals. 2015 WL 1299284, at *13. After reviewing the contractual provision defining the medical director's responsibilities, the court found that the contract "does not say that the On-Site Medical Director sets policy for Wexford." *Id.*, at *14. The court also found that Wexford's policies and procedures limited the medical director to making a "*request* that Wexford's corporate office approve a referral for a consultation[.]" *Id.* (emphasis in original). According to the court, these contractual provisions demonstrated that Dr. Ghosh was merely "a decisionmaker who exercised certain discretion delegated to him by Wexford," such that a decision by Ghosh "not to request a referral in Jones's situation, although it meant that Jones did not get a referral, does not mean that he made Wexford's policy about referrals." *Id.*

The Court here similarly concludes that a reasonable jury could not find from the contractual language that Dr. Obaisi was a Wexford policymaker, and that the decisions from the Seventh Circuit and district courts in Illinois support this conclusion.

To begin, as the court in *Jones* found, the Court agrees that the contract "does not say that the On-Site Medical Director sets policy for Wexford." 2015 WL 1299284, at *14. Rather, it assigned Dr. Obaisi, as the medical director at Stateville, responsibility for planning, implementing, directing, and controlling clinical care at the prison. Nor does the contract support a reasonable inference that Dr. Obaisi had *carte blanche* in directing clinical care at Stateville, such that he might plausibly be found to be a *Monell* policymaker. To the contrary, the contract stipulated that Obaisi "shall operate the medical and mental health care program in accordance with State Regulations and statutes, and in accordance with accepted standards of medical

practice." [254-11] 21. Likewise, Dr. Obaisi was required to "coordinate with the HCUA"–the Health Care Unit Administrator, an IDOC employee "responsible for supervising the operation and activities of the health care unit at a prison" [*id.*] 76– "in the execution of the duties under this contract." [*Id.*] 21. This contractual language establishes the existence of multiple constraints on his ability to control clinical decision-making at Stateville. *See Wragg*, 604 F.3d at 468.

Other evidence in the record demonstrates that Wexford, not Dr. Obaisi, set the policies that governed how care was provided at Stateville. To begin, while Dr. Fisher described the medical director as "the leader of the clinical team at Stateville," he also testified that the medical director "is not involved in every clinical decision that is made." [241-4] 12, at 42:6-9, 21-22. Contrary to plaintiff's contention, moreover, that Wexford does not have "meaningful" policies for treating inmates, Dr. Fisher testified that Wexford maintains "policies and procedures" (which it calls "guidelines") that are "clinical pathways" for treating different conditions. [241-4] 52, at 204:18-21; *see also* [*id.*] 49, at 190:10-16. Fisher explained that the guidelines "do not take into account every patient's circumstances or the uniqueness of each case," [*Id.*] 49, at 190:17-19, and that "our clinicians may or may not use" the guidelines when treating an individual case. [*Id.*] 52, at 204:21-22. But the premise of plaintiff's argument–that these guidelines do not amount to official policy because they permit individual clinicians to exercise discretion when treating inmates–is entirely unsupported.

Still more evidence in the record demonstrates that Obaisi was not a final policymaker because his decisions were subject to "meaningful review." *Wragg*, 604 F.3d at 468. Dr. Fisher testified that, "in terms of clinical decision making," a regional medical director operated "above the medical director position at Stateville." [241-4] 12, at 43:15-20. He also testified that Wexford's "corporate medical directors . . . may be involved with individual decisions." [*Id.*] 12, at 43:20-22. In the same vein, Fisher explained that (1) Wexford "does peer reviews of all of our clinicians to have another individual, another clinician look at the care," (2) collegial review is another mechanism for "reviewing cases and reviewing the care," and (3) a "quality improvement program . . . occurs at the IDOC level that looks at the care that's ongoing at the site." [*Id.*] 12, at 44:4-15. The Court agrees that this evidence demonstrates that Obaisi was "a mid-level employee in the Wexford corporate hierarchy" who was "expected to follow" Wexford's guidelines respecting clinical operations and patient care, and not a policymaker in his own right. *Ambruster*, 2019 WL 5874335, at *19-20.

LaTonya Williams testified, to be sure, that, "in general," the medical director was "ultimately responsible for the medical care of the inmates at Stateville." [241-2] 25, at 95:21-96:4. But this testimony, just like the contractual language plaintiff relies on, does not establish that Obaisi had final policymaking authority respecting inmates' medical care. Obaisi was certainly a final decisionmaker over the medical

treatment that plaintiff (and likely many other inmates) received, but his decision-making power was constrained by state laws, state regulations, and accepted standards of medical practice; his decisions as a clinician were subject to review by multiple people and in multiple ways; and there is no evidence showing that he was granted authority to set Wexford's policy respecting inmates' medical care at Stateville.

Taken together, this evidence–particularly when viewed in light of other cases rejecting claims that Wexford's onside medical directors are *Monell* policymakers–does not permit a reasonable jury to find that Dr. Obaisi was a final policymaker.

But even if the Court were to assume, as plaintiff contends, that Obaisi was a "final policymaker with respect to clinical treatment at Stateville," a rational jury still could not find for plaintiff on his *Monell* claim. Plaintiff does not identify any specific policy that Dr. Obaisi allegedly enacted or how such a policy injured him, *see* [256] 23-24; [340] 11-12, and there is no dispute that Wexford, not Obaisi, promulgated the collegial review and UIC referral policies at issue in this case. Rather, plaintiff's argument seems to be that every decision Dr. Obaisi made while treating him represents an official policy choice by Wexford. *See* [340] 11. While this argument is difficult to square with the undisputed evidence that Wexford has created guidelines governing the treatment of inmates' medical conditions and imposed constraints on medical directors' decision-making powers, the more fundamental problem is that the argument conflates individual instances of treatment choices with official policymaking. The Court therefore finds that what the Seventh Circuit said about Wexford's medical director in *Whiting* applies with full force to this case: Dr. Obaisi "may have had the final say on [plaintiff's] treatment plan and thus was the final *decision-maker* with his care," but "that's not nearly enough to show he was the final *policymaker*." 839 F.3d at 664 (emphases in original). That Wexford drew a distinction between Obaisi's role as leader of the clinical team, on the one hand, and as a treating physician, on the other, is apparent from the contract on which plaintiff relies. In addition to assigning the medical director responsibility for planning and controlling clinical care, the contract specifies that the medical director "shall also provide primary healthcare services on a routine basis." [254-11] 21. As the Court's summary judgment decision explains in more detail, *see Ryburn*, 2020 WL 3868715, at *7-11, the individual claim against Dr. Obaisi focuses on his (1) failure to ensure plaintiff returned for a follow-up neurological evaluation, (2) decision to cancel a second referral for a neurological evaluation, and (3) cancellation of a referral to an offsite neuropsychologist. These appear to be acts taken in his role as a provider of "primary healthcare services" to plaintiff, and not in any alleged policymaking role.

For all these reasons, Wexford is entitled to summary judgment on plaintiff's *Monell* claim based on Dr. Obaisi's status as a Wexford policymaker.

### E. Request for Additional Discovery

Finally, plaintiff argues that, if the Court determines that "*Dean* has shifted the law in the way Wexford suggests and that a plaintiff must provide evidence of other inmates' treatment," the Court should grant plaintiff leave to take additional discovery. [340] 15. Wexford opposes this request, arguing, *inter alia*, that plaintiff's burden of proof on a *Monell* claim has not changed, and that *Dean* "did not change Plaintiff's evidentiary requirements for proving a *Monell* claim." [341-1] 15. The Court denies plaintiff's request. As explained above, while *Dean* emphasized the importance of pattern or practice evidence, the Court agrees with plaintiff that *Dean* did not hold that such evidence must be introduced in every case bringing a *Monell* claim against a facially lawful policy. Moreover, the law was clear before *Dean* that pattern or practice evidence is often critical to a *Monell* claim challenging a facially lawful policy. *See Dean*, 18 F.4th at 240 ("Consistent with the Supreme Court's guidance, we have repeatedly rejected Monell claims that rest on the plaintiff's individualized experience without evidence of other constitutional violations."). Because the law governing plaintiff's case has not changed, there is no basis to permit a reopening of discovery to pursue pattern or practice evidence now.

### Conclusion

For the reasons set forth above, Wexford's second motion for reconsideration [334] is granted. That portion of the Court's Memorandum Opinion and Order denying Wexford's motion for summary judgment on plaintiff's *Monell* claim is hereby vacated, and the Court enters summary judgment in favor of Wexford on plaintiff's *Monell* claims. This case will proceed to a jury trial only on the Eighth Amendment claim against Dr. Obaisi in his individual capacity.

_____
**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: May 6, 2022**